**FILOR, BULLARD & SMYTH, Plaintiff-Appellant,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant-Appellee.**

Nos. 567, 568, Dockets 77–7468, 77–7488.

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1978.

Decided September 21, 1978.

Lewis A. Kaplan, New York City (Richard Wasserman, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City), for plaintiff-appellant.

Joseph A. Kilbourn, New York City (Bigham Englar Jones & Houston, New York City), for defendant-appellee.

Before LUMBARD, FEINBERG and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

These are consolidated appeals, pursuant to Fed.R.Civ.P. 54(b), from an order and judgment entered in the Southern District of New York, Lawrence W. Pierce, *District Judge,* which, respectively, denied cross-motions for summary judgment and, after a bench trial, dismissed on the merits one count of a four-count complaint in a diversity action brought by the insured, a broker-dealer member of the New York Stock Exchange, to recover $963,180.50 on a brokers blanket bond, that being the loss sustained by the insured as the result of certain cashiers checks drawn and signed by the president of a bank as part of his scheme to embezzle money from the bank.

The question presented, which is easier to state than to resolve, is whether the checks thus drawn and signed by the president of the bank were "forgeries" as to the bank within the meaning of the brokers blanket bond issued to indemnify against loss through forgery of signatures on checks.

The district court held that the checks were not forgeries within the meaning of the brokers blanket bond. For the reasons below, we reverse and remand.

## I.

Plaintiff Filor, Bullard & Smyth ("Filor" or "the insured") is a New York partnership engaged in the business of a securities broker-dealer. It formerly was a member of the New York Stock Exchange ("NYSE").

Defendant Insurance Company of North America ("INA" or "the insurer") is a Pennsylvania corporation engaged in a nationwide insurance and surety business, including the writing of brokers and bankers blanket bonds. It wrote the brokers blanket bond here involved. It is a wholly-owned subsidiary of INA Corporation, a NYSE listed company.

Douglas A. Schotte, who drew and signed the cashiers checks here in question, was president of the Eatontown National Bank (the Bank) of Eatontown, New Jersey. Neither Schotte nor the Bank are parties to this action.

After Schotte's defalcations were discovered, the Bank was declared insolvent. The Federal Deposit Insurance Corporation (FDIC) became its receiver by operation of law. It stopped payment on the checks involved. It is not a party to the instant action. It is a party to a related action which it commenced in the District of New Jersey against Filor and others, Civ. Action No. 264–72. Proceedings on Counts Two, Three and Four of the instant action have

been severed from Count One pending the outcome of the New Jersey action.

## II.

The fraudulent scheme, of which the issuance of the fourteen checks here involved was a part, began in July 1967 and October 1968. During those months, Schotte, who was president and chief executive officer of the Bank, opened with Filor two brokerage accounts. They were in the name of "Eatontown National Bank, Attn: Douglas J. Schotte". Using these accounts, Schotte began trading in securities, falsely representing to Filor that he was doing so on the order, and for the account, of unidentified customers of the Bank.[1] Actually, as it later was proven, Schotte's trading in securities through the two accounts with Filor was for his own personal benefit. He used funds embezzled from the Bank to speculate in the stock market.

It is undisputed that neither Filor nor any officers, employees or directors of the Bank had any knowledge of Schotte's fraudulent scheme or of his embezzlement of Bank funds as part of the scheme.[2] It also is undisputed that Schotte's acts pursuant to this scheme were dishonest, fraudulent and criminal.[3]

Schotte's defalcations were first discovered in mid-1970. The fourteen checks here involved, which aggregated $963,180.50, were drawn and delivered by Schotte to Filor during the six day period between July 31, 1970 and August 5, 1970. Each check was drawn on the Bank and was signed by Schotte in his own name, followed by the printed legend, "Auth. Sig." The checks were delivered by Schotte to Filor in return for securities which had been ordered by Schotte pursuant to the fraudulent scheme described above.

On August 7, 1970, two days after the last of the fourteen checks referred to above was delivered by Schotte to Filor, the Bank was declared insolvent by the Comptroller of the Currency and the FDIC was appointed receiver of the Bank's assets pursuant to 12 U.S.C. § 1811, et seq. (1970).

When the fourteen checks were presented for payment by Filor to the FDIC, the latter refused payment.[4] Filor thereupon filed a proof of claim with INA on the ground that its loss was covered by the policy issued by INA because Schotte's signature was a forgery within the meaning of Clause D of the brokers blanket bond which provides that INA will indemnify Filor against "[l]oss through forgery as to a sig-

---

1. Schotte accomplished this by improperly obtaining the *full* combination to the bank vault in which the blank cashiers checks were kept. An officer in his position was entitled to only *half* the combination.

2. The Bank's by-laws authorized its president, vice-presidents, and other officers designated by its board of directors to sign the Bank's contracts, checks and other instruments.

   The Bank's board of directors, however, never authorized Schotte to open the accounts at Filor nor to buy and sell securities through those accounts.

   The transactions underlying Schotte's defalcations, including the fourteen cashiers checks here involved, therefore, were not made on behalf of the Bank in the regular course of its business and were not carried out on behalf of the Bank's customers. Indeed, they were concealed from the Bank's other officers and directors.

   Under the National Bank Act, 12 U.S.C. § 24 (Seventh) (1970), the Bank was prohibited from trading in securities for its own account. Although Schotte had general authority to sign checks on behalf of the Bank, the underlying

transactions and the signing of the checks here involved were unauthorized. *Wen Kroy Realty Co. v. Public National Bank and Trust Co.,* 260 N.Y. 84, 89–90, 183 N.E. 73, 74 (1932).

3. On August 11, 1970, Schotte was arrested and later indicted on April 20, 1971 in the United States District Court for the District of New Jersey on 168 counts of conspiracy and misapplication of bank funds. On July 25, 1972, he pleaded guilty to three counts.

4. The FDIC refused payment on the fourteen checks on the grounds that (a) the purchases of securities for which the checks were issued were not made on the order or for the account of customers of the Bank and, in the FDIC's opinion, therefore, "were illegal, void and in contravention" of statutes which prohibited such purchases; and (b) the checks were delivered in connection with a dishonest, fraudulent and criminal scheme perpetrated by Schotte and, in the FDIC's opinion, the FDIC therefore had no obligation or legal responsibility to make payment on the cashiers checks.

nature." From the district court's rejection of Filor's claim (which previously had been rejected by INA), the instant appeal has been taken. We agree with Filor and, accordingly, reverse the district court and order that judgment be entered for the full amount of Filor's claim, together with interest and costs according to law.

### III.

The bond here involved is a standard form of brokers blanket bond. It not only was prepared in its entirety by INA, but each of its terms was formulated by INA and its attorneys, including the critical Clause D which covers loss through forgery of signatures on checks delivered to the insured.

Filor as a member of the NYSE was required by Rule 319 of the NYSE to obtain and have in effect such a bond to insure against loss through check forgeries, inter alia, as a condition of doing business as a broker-dealer.[5]

Insuring Clause D of the brokers blanket bond here involved provided in relevant part that INA would indemnify Filor against:

"Loss through forgery as to a signature, . . . on or in any . . . checks . . . which are directed to the In-

sured and authorize . . . the transfer, payment, delivery or receipt of any funds or Property and bear the forged signature of . . . any customer, stockbroker, banker or other financial institution. . . ."

The issue thus presented is whether Schotte's action in drawing and signing the fourteen cashiers checks constituted forgery as to the signature of the Bank within the meaning of Clause D of the brokers blanket bond.[6]

. Filor contends that Schotte "forged" the checks within the present meaning of New York law; and that INA therefore must indemnify it for losses sustained, inasmuch as INA's blanket brokers bond protects Filor against "loss through forgery." Alternatively, Filor contends that "forgery" as used in the blanket brokers bond is ambiguous in view of recent developments in the law; and that it therefore must be construed against INA as the insurer.

In reversing the district court and remanding with directions to enter judgment for Filor, we rest our decision on Filor's alternative contention. As explained below, however, we shall indicate our views on Filor's other contention, albeit by way of dictum.

---

**5.** The history of the present Rule 319 of the NYSE goes back nearly forty years to the defalcations of Richard Whitney as president of the NYSE. See Report of the Securities and Exchange Commission, pursuant to Section 21(a) of the Securities Exchange Act, dated November 1, 1938, in the *Matter of Richard Whitney, et al.*

While much time was spent in the district court regarding Filor's offer of, and INA's objections to, evidence of the history and purpose of the bond requirement reflected in the present Rule 319, we take judicial notice that one of the business purposes of Rule 319 is to require member firms dealing with the public to carry insurance coverage against losses through check forgery. See Report of NYSE Public Examining Board on Consumer Protection, under heading "Specific Recommendations for Greater Customer Protection" at 10, 16–17 (1939). The Board that made this Report was appointed in 1939 by William McChesney Martin, then president of the NYSE.

**6.** At the time of Schotte's defalcations here involved, there were in effect two other bonds issued by INA to the Bank, i. e. other than the brokers blanket bond which is the subject of this case: an employee dishonesty blanket bond and a bankers blanket bond. Both insured the Bank in substance against loss through "dishonest, fraudulent or criminal act[s]" of its employees. After Schotte's scheme was discovered and the Bank was placed in receivership, the receiver, FDIC made a claim on the INA bonds for losses allegedly sustained by the Bank by virtue of Schotte's activities. In connection with that claim, INA entered into an agreement which specifically acknowledged that the fourteen cashiers checks here at issue constituted "potential . . . losses *covered by said bonds*" and, therefore, that the issuance of those checks by Schotte constituted "dishonest, fraudulent or criminal act[s]" (emphasis added). As the district court concluded, "There is no dispute that Schotte's acts were dishonest, fraudulent and criminal."

### IV.

■ Turning to what we regard as the decisive issue in the case, we take it to be common ground that an ambiguous term in an insurance contract must be construed against the insurer which wrote the contract. Since New York substantive law is controlling, we note that the New York Court of Appeals follows the generally accepted rule stated above:

"*[T]he burden in such a case as this is on the defendant to establish that the words and expressions used [in the policy] not only are susceptible of the construction sought by defendant but that it is the only construction which may fairly be placed on them.* The defendant in its large illuminated lettering and in its application could have added proper, unambiguous words or a definition . . . thus removing the ambiguity or equivocal character of the invitation to insure, of the application for insurance and the contract of insurance itself." *Lachs v. Fidelity & Casualty Co. of New York,* 306 N.Y. 357, 365–66, 118 N.E.2d 555, 559 (1954) (emphasis added).

We have applied this rule where appropriate. *See, e. g., Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 999–1000 (2 Cir. 1974).

The narrow issue for determination, therefore, is whether INA's construction of "forgery" is the only fair one that could be placed on that term at the time the blanket bond was written. Although an unauthorized signature may not have constituted a forgery under New York law at the time of our decision in *Fitzgibbons Boiler Co. v. Employers' Liability Assurance Co.,* 105 F.2d 893 (2 Cir. 1939), discussed more fully *infra,* subsequent developments in the law, also discussed more fully *infra,* render the term "forgery" ambiguous as applied here.

Prior case law regarding losses which result from an unauthorized signature indicates that the circumstances surrounding Filor's loss were neither unique nor unforeseeable. Moreover, the nature of this risk is such that it could have been identified and described with particularity. INA was aware of the ambiguity of the term "forgery". It was in the best position to eliminate the ambiguity. The blanket brokers bond was in the standard form, drafted by INA, which had notice that the term "forgery" was ambiguous. INA's attorneys were aware of the conflicting decisional law, discussed more fully *infra,* reflecting the ambiguity of the term "forgery". *See, e. g.,* Maurice, *Recent Developments in Claims under Blanket Bonds,* 1965 Proc. ABA Ins. Section, at 27; Maurice, *Forgery in the Law of Insurance,* 1960 Proc. ABA Ins. Section, at 81; Farnsworth, *Insurance Against Check Forgery,* 60 Colum.L.Rev. 284, 313–16 (1960). Nevertheless, in drafting Insuring Clause D, INA failed to refer to or to exclude a loss resulting from an unauthorized signature.

Our construction of the term "forgery" in favor of the insured also strikes us as being in accord with the intent of the parties. Absent a specific exclusion, Filor reasonably could have assumed that the blanket brokers bond covered a known risk such as a loss sustained as the result of an unauthorized signature. Indeed, INA fails to suggest any other type of "forgery" to which this coverage of the bond applies. And, as indicated above, Filor was required by Rule 319 of the NYSE to obtain and maintain in effect this bond to insure against loss through check forgeries. This rule obviously is intended to protect member firms and the public investor against precisely the type of loss here involved. The rule specifically so provides.

■ We hold that the term "forgery" as used in the blanket brokers bond, having been rendered ambiguous by recent developments in the law, must be construed against INA as the insurer, and that judgment accordingly must be entered in favor of Filor.

### V.

This brings us to the other ground, referred to above, upon which appellant relies for reversal, namely, that the New York courts would hold that the fourteen cashiers

checks here involved were "forged" as a matter of law.

Having ruled that judgment must be entered in favor of appellant on the alternative ground that recent developments in the law have rendered ambiguous the term "forgery" as used in this bond, our discussion under this section of our opinion is dictum. We believe it is appropriate for us to state our views on this issue, however, because it does have some bearing on the alternative ground upon which we have ruled in favor of appellant.

The district court, in deciding the case in favor of appellee, quite understandably relied heavily on our decision in *Fitzgibbons Boiler Co. v. Employers' Liability Assurance Co.*, 105 F.2d 893 (2 Cir. 1939) (A. N. Hand, J.). There we held that unauthorized action by a corporate officer in signing corporate checks did not constitute forgery, so long as the officer's signature was genuine as it appeared on the checks. In so holding, we were merely attempting fairly to state New York law as it then existed. New York law, however, has changed. And although *Fitzgibbons* probably stated New York law accurately in 1939, there are substantial reasons for doubting its viability today.

First, in 1967 New York substantially revised its penal law concerning forgery to including writings unauthentic because not authorized.[7] The only New York state court decision, so far as we know, which has addressed the question of an unauthorized signature on behalf of a corporation under the amended statute is *People v. Dairylea Cooperative, Inc.* (Sup.Ct., Albany Co., 1975) (unreported), *aff'd*, 52 A.D.2d 1004, 383 N.Y.S.2d 877 (3d Dept. 1976), where the Supreme Court in dictum stated:

"The essential element of forgery has to do with the making of the instrument . . . . The defendant must have falsely made the document (*pretending to have authority of a real nature when he does not*); 'falsely completed' the document . . . ; or 'falsely altered' the document . . . ." (slip op. at 14–15, October 16, 1975) (emphasis added).

Second, the Model Penal Code makes explicit the drafters' intention to overrule *Fitzgibbons.* See American Law Institute, Model Penal Code, Commentary to § 223.1 [later § 224.1], 83 n. 18 (Tent. Draft No. 11, 1960).[8]

Third, courts in California, Michigan, and Illinois[9] appear to favor including actions such as Schotte's within the scope of forgery.

For these reasons, if we were required to decide this case on this ground, we would hold that *Fitzgibbons* no longer reflects New York law as it now exists and that the

---

7. As amended in 1967, the New York Penal Law in relevant part provides:

"A person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure another, he *falsely makes,* completes or alters a written instrument." N.Y. Penal Law § 170.05 (McKinney 1975) (emphasis added).

\* \* \*

"A person 'falsely makes' a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or *because, if real, he did not authorize the making or drawing thereof.*" N.Y. Penal Law § 170.00, Subd. 4 (McKinney 1975) (emphasis added).

8. Section 224.1 of the Model Penal Code, which is substantially the same as the New York Penal Law, note 7 *supra,* provides that a person is guilty of forgery if he

"makes, completes, executes, authenticates, issues or transfers any writing so that it purports to be the act of another *who did not authorize that act* . . . ." Model Penal Code § 224.1 (Prop. Off'l Draft 1962) (emphasis added).

The Commentary to this section states:
"An important doctrine of forgery law by which the offense is distinguished from ordinary false pretense is the requirement that the falsity relate to authenticity. . . . [W]here an instrument purports to be executed by an agent, the prevailing rule, *which we propose to change,* is that there is no forgery even if the agent knew he lacked an authority." Model Penal Code § 223.1 [later § 224.1], comment (Tent. Draft No. 11, 1960) (emphasis added).

9. *Century Bank v. St. Paul Fire and Marine Ins. Co.*, 4 Cal.3d 319, 93 Cal.Rptr. 569, 482 P.2d 193 (1971); *People v. Sousalla,* 392 Mich. 387, 220 N.W.2d 405 (1974); *People v. Young,* 19 Ill.App.3d 455, 311 N.E.2d 609 (1974).

New York Court of Appeals probably would hold that the fourteen cashiers checks were "forged" as a matter of law. In view of the alternative ground upon which we have rested our decision, however, we follow the preferred practice of our Court[10] of not anticipating rulings of the New York courts when we are not required to do so.[11]

Reversed and remanded with directions to enter judgment in favor of plaintiff against defendant in amount of $963,180.50, together with interest and costs according to law.

LUMBARD, Circuit Judge (concurring):

Decision in this appeal turns upon whether unauthorized but otherwise genuine signatures are "forgeries" under New York law. In this diversity action, the brokerage firm of Filor, Bullard & Smyth [Filor] seeks to recover from its insurer, Insurance Company of North America [INA], losses Filor suffered when Douglas Schotte, formerly President of Eatontown National Bank, wrote fourteen unauthorized cashier's checks to the order of Filor. Using the funds so obtained, Schotte began trading in securities for his own personal benefit, falsely representing to Filor that he was trading on behalf of unidentified customers of the bank. The parties agree that New York law governs this case. Appellant Filor claims that Schotte "forged" the checks within the present meaning of New York law, and that INA must therefore recompense Filor for the losses incurred, inasmuch as Filor's contract with INA protects against "loss through forgery." Alternatively, Filor seeks to show that the meaning of the word "forgery" as used in its insurance bond is ambiguous and must therefore be construed against the insurer. Since we all agree that recent developments in New York law have rendered the scope of the term "forgery" ambiguous with respect to Schotte's defalcations, and that appellant Filor is therefore entitled to recover on its insurance bond, we need not anticipate the

New York courts on an unsettled question of New York law.

To be sure, at one time New York law seemed relatively clear on this point. In *Fitzgibbons Boiler Co. v. Employers' Liability Assurance Co.*, 105 F.2d 893 (2d Cir. 1939), this court held that unauthorized action by a corporate officer in signing a corporate check was not forgery, so long as the officer's signature was genuine. In so holding, this court attempted to state New York law as it then existed. But New York law on this point has since changed.

In 1967 New York revised its statutory definition of forgery to include writings unauthentic because not authorized. New York Penal Law § 170.00[4]. In framing this revision, the New York legislature followed the approach adopted by the Model Penal Code. *Compare* ALI, Model Penal Code § 224.1 (Proposed Official Draft 1962). The commentary to the Model Penal Code makes explicit the drafters' determination to overrule *Fitzgibbons*. ALI, Model Penal Code, Commentary to § 223.1, 83 n. 18 (Tent. Draft No. 11, 1960). Thus *Fitzgibbons* is no longer consistent with New York statutory law.

New York case law has also departed from the view articulated in *Fitzgibbons*. Although New York case law is by no means conclusive on the question whether unauthorized but otherwise genuine signatures are forgeries, dictum in *People v. Dairylea* (Sup.Ct. Albany Co., 1975), *aff'd*, 52 App.Div.2d 1004, 383 N.Y.S.2d 877 (3d Dept. 1976), follows the Model Penal Code view. Courts in California, Michigan, and Illinois, furthermore, favor including malefactions such as Schotte's within the scope of forgery. *See, e. g., People v. Young*, 19 Ill. App.3d 455, 311 N.E.2d 609 (1974).

That these developments in statutory and case law have rendered the term "forgery" ambiguous as used in Filor's insurance bond is by itself sufficient to require reversal of the court below and judgment for appellant

---

10. *Wilson v. Fogg*, 571 F.2d 91, 95 (2 Cir. 1978); *Cameron v. Fastoff*, 543 F.2d 971, 978 & n. 7 (2 Cir. 1976).

11. In view of our rulings above, we find it unnecessary to reach appellant's claims of error based on the district court's exclusion of evidence asserted to be relevant to construing the blanket brokers bond here involved.

Filor. As with the drafter of any contract, the insurer pays the price of ambiguity. *See Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 999–1000 (2d Cir. 1974); *Lachs v. Fidelity & Casualty Co. of New York,* 306 N.Y. 357, 365–66, 118 N.E.2d 555, 559 (1954). Under New York law, the term "forgery" is at least ambiguous enough to encompass genuine but unauthorized signatures. INA, moreover, was undoubtedly aware of the ambiguity in its agreement with Filor, *see, e.g.,* Maurice, Recent Developments in Claims Under Blanket Bonds, *1965 Proc. ABA Ins. Section,* at 27, and could easily have avoided any uncertainty by inserting clarifying language in the bond which it drafted.

Having found the meaning of the term "forgery" ambiguous under New York law, we need not—and should not—hazard a prediction of what the New York courts will do when and if they reach this issue. When a case may be decided on other grounds, federal-state comity requires that federal courts refrain from unnecessarily anticipating state court decisions.