**BOARD OF EDUCATION, YONKERS CITY SCHOOL DISTRICT, Plaintiff–Appellee,**

v.

**CNA INSURANCE COMPANY and Continental Casualty Co., Defendants–Appellants.**

No. 425, Docket 87–7690.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1988.
Decided Jan. 29, 1988.

P. Daniel Hollis, Anderson, Banks, Moore, Curran & Hollis, Mount Kisco, N.Y. (Lawrence V. Thomas, James P. Drohan, of counsel), for plaintiff-appellee.

Frank L. Amoroso, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y. (David P. Franks, Evan H. Krinick, of counsel), for defendants-appellants.

Before KAUFMAN, CARDAMONE and PRATT, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Appellant Continental Casualty Company, (the company), a member of the CNA Insurance Group, is the primary liability insurer for the appellee, the Board of Education of the City of Yonkers (the Board). Under the terms of a 1978 liability policy, the company agreed to indemnify the Board, up to $3 million, for a broad spectrum of possible liabilities. The policy, however, is not all-inclusive. It contains a substantial number of coverage exclusions. The appellants now ask us to determine that the policy excludes defense costs attributable to racial discrimination claims.

This litigation arises in the aftermath of a civil rights action, brought in 1980, where the United States Department of Justice and the Yonkers branch of the National Association for the Advancement of Colored People charged the Board with intentional school segregation. In 1985, after a protracted bench trial, Judge Leonard Sand of the United States District Court for the Southern District of New York found that the Board had violated the 1964 Civil Rights Act, 42 U.S.C. § 2000c *et seq.*, § 2000d *et seq.* (1982), *U.S. v. Yonkers Board of Education,* 624 F.Supp. 1276, 1289 (S.D.N.Y.1985), and subsequently imposed a wide range of remedial sanctions, *U.S. v. Yonkers Board of Education,* 635 F.Supp. 1538 (S.D.N.Y.1986). This court recently affirmed those rulings in all respects, *U.S. v. Yonkers Board of Education,* 837 F.2d 1181, 1184, (2d Cir.1987). The instant dispute derives from the Board's attempt to gain reimbursement under the policy for defense costs incurred in those proceedings.

We note at the outset that this appeal does not require any discussion of the Board's discriminatory conduct. Indeed, this court has already passed on the merits of the underlying claim. Nor are we called upon to weigh the wisdom of permitting public entities to insure themselves against costs associated with such practices. That is the legislature's responsibility. We are asked simply to interpret a legally valid insurance contract and determine the respective rights and liabilities of the parties.

On December 4, 1980, the Board notified its insurance broker that the Justice Department had filed the complaint in the underlying action. The broker, in turn, forwarded the complaint to Continental, requesting its position pertaining "to the defense of this matter." Following a spate of internal memoranda, the company responded on April 10, 1981, conceding that the policy would "respond for defense and investigative costs in connection with this litigation," but disclaiming liability for the costs of implementing a desegregation plan.

For more than four years, the parties remained in close communication as the underlying litigation progressed. Both unsolicited and upon request, Continental received reports prepared by defense counsel, outlining the substantive and procedural status of the case. The Board regularly apprised Continental of attorneys' fees incurred. In addition, representatives of the Board and the company met at least twice to discuss the litigation. Although Continental occasionally complained that it required more information, it never contradicted its initial willingness to cover defense costs.

The company's change of heart did not occur until shortly after July 29, 1985, when the Board formally demanded reimbursement of attorneys' fees to date. Rather than comply, Continental hired an outside auditor to analyze the Board's defense costs. The Board cooperated fully in the audit. Throughout September, the parties exchanged correspondence further detailing fees and expenses, but still no payments were received from the insurer. Finally, for a second time, on October 8, 1985, the Board demanded reimbursement.

By letter dated October 15, 1985, the company advised the Board it no longer intended to reimburse defense costs. Rather, it contended, the policy "would preclude any coverage and/or payment" of costs resulting from discrimination claims. The Board commenced this action three weeks later, charging that Continental's refusal to pay breached the agreement between them.

Before the case reached trial, however, both parties moved for summary judgment, alleging the plain language of the policy supported their respective proposed constructions. Continental argued that the policy's "Clarification Endorsement" excluded all costs associated with segregation. The Board responded that the provision's ambit was narrower, applying only to the substantive costs incurred by virtue of its discrimination, and that the policy's "New York State Provision" specifically brought defense costs within the contemplated coverage. By order dated November 19, 1986, Chief Judge Brieant granted the Board's motion for summary judgment, holding that the policy covered the costs in question and that Continental had therefore breached its contractual obligation. *Board of Education, Yonkers City School District v. CNA Insurance Co.*, 647 F.Supp. 1495 (S.D.N.Y.1986). Damages were stipulated at $2.75 million. This appeal by Continental ensued, with the parties repeating substantially the same contentions.

Unfortunately, the policy is less than a model of clarity. Substantial ambiguity permeates the agreement, compelling us to parse the document to ascertain its meaning. Nonetheless, based upon the language of the policy, the conduct of the parties and the rules of contractual construction, we find that the policy includes the costs in question, and thus we affirm Chief Judge Brieant's judgment.

Our analysis necessarily begins with the "Insuring Clause," the driving force governing the agreement. In general terms, it delineates the policy's coverage. Specifically, it requires the company to reimburse "all *loss* which the [Board] ... shall become legally obligated to pay." (emphasis added). The question, then, becomes whether defense costs incurred during a desegregation action constitute "loss" under the terms of the policy. For the answer, we turn to the policy's definition section.

> "Loss" as defined in the policy includes: judgments, settlements and costs, *cost of investigation and defense of legal actions* (excluding from such costs of investigation and defenses, salaries of officers or employees of the School District or any other governmental body) *claims or proceedings and appeals therefrom,* costs of attachment or similar bonds....

(emphasis added). Indisputably, the costs in issue derive from "defense of legal actions" and "appeals therefrom," and hence comport with the definition of "loss." The policy must be read as a whole, however, *American Home Products Corp. v. Liberty Mutual Insurance Co.*, 565 F.Supp. 1485, 1492–93 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984), and

the definition of "loss" is not entirely self-contained. Rather, it is subject to two potentially conflicting provisions, one apparently authorizing coverage, the other seemingly limiting it. Our task is to reconcile them.

Not surprisingly, the parties proffer different provisions as determinative. Continental correctly observes that the "Clarification Endorsement" excludes coverage of "loss" associated with racial discrimination. By extension, the company contends, this provision also excludes coverage of legal costs. It states:

> Nothing in this policy shall be construed to insure loss arising out of or in any way attributable to:
>
> 1) any failure to integrate or desegregate the student enrollment or participation in any school district, school or education or extra-curricular program on the basis of race, ethnic background or national origin, or, ...
>
> 3) causing or allowing the student enrollment or participation in any school district, school or education or extra-curricular program to be operated or administered on a discriminatory basis because of race, ethnic background or national origin.

(emphasis added). In essence, then, Continental equates the substantive costs resulting from the Board's actual discrimination, for example remedial programs, with those, such as legal fees, which are defense-related. To effectuate the provision, the company contends, both substantive and defense costs must be excluded. So long as the underlying claim raises discrimination allegations, it argues, the policy is inoperative.

We have good reason, however, to distinguish between the two classes of expenses. The "Clarification Endorsement" presupposes a finding of illegal conduct. Remedial programs become necessary only after discrimination has been established. Legal fees, on the other hand, accrue from the outset of a dispute and without regard to an allegation's veracity. Hence, such fees would be outside the provision's contemplation. Indeed, Continental's proposed construction could deny coverage to an innocent party.

Moreover, as the Board reminds us, the "clarification endorsement" is not dispositive of the policy's position regarding desegregation actions. The "New York State Provision" also governs defense costs in this context. Appended to the policy as an exclusion, this provision denies liability:

> for injury arising out of discrimination because of race, religion, nationality, national origin, creed, color, sex or age.

At the same time, however, by its own terms:

> this exclusion shall not apply to the fees, costs and expense attributable to the investigation, defense and appeal of any claim alleging such discrimination if such fees, costs and expenses are included in the definition of loss contained in this contract.

(emphasis added). Thus, the provision conflicts with Continental's broad reading of the "clarification endorsement" because it expressly authorizes reimbursement of "fees, costs and expense" incurred defending against discrimination claims.

As a preliminary matter, we note that New York law controls this action, *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and accordingly, Continental bears the burden of demonstrating its preferred construction is the only reasonable one. *Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158 (2d Cir.1978) *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979). *Sincoff v. Liberty Mutual Fire Ins. Co.,* 11 N.Y. 2d 386, 230 N.Y.S. 2d 13, 183 N.E.2d 899 (1962); *Cantanucci v. Reliance Insurance Co.,* 43 A.D.2d 622, 349 N.Y.S. 2d 187 (N.Y.App.Div.1973), *aff'd mem.,* 35 N.Y. 2d 890, 364 N.Y.S. 2d 890, 324 N.E.2d 360 (1974). Moreover, to reconcile conflicting provisions, basic principles of interpretation require that insurance policies be construed in favor of the insured, *Miller v. Continental Ins. Co.,* 40 N.Y.2d 675, 678, 389 N.Y.S. 2d 565, 567, 358 N.E.2d 258 (1976), and against the drafting party, *United States Fidelity and Guaranty Co. v. Annunziata,* 67 N.Y.2d 229, 232, 501 N.Y.S.2d 790,

791, 492 N.E.2d 1206, 1207 (1986); *Greaves v. Public Service Mutual Insurance Co.,* 5 N.Y.2d 120, 125, 181 N.Y.S.2d 489, 155 N.E.2d 390 (1959). Any remaining ambiguity or competing construction would weigh in favor of coverage. Thus we are faced with a presumption in the Board's favor.

Continental cites a broad provision that discusses discrimination actions generally and applies it to our particularized concern. The Board, in contrast, relies on a far narrower provision which refers directly to defense costs. Normally, where broad and specific language conflict, the specific language would control. *John Hancock Mutual Life Ins. Co. v. Carolina Power and Light Co.,* 717 F.2d 664, 669 n. 8 (2d Cir. 1983). The provisions, however, can be reconciled.

As the district court observed, the "Clarification Endorsement" contains no direct reference to defense costs. It speaks only to losses from discrimination generally. The "New York State Provision" also bars recovery of discrimination costs. But where the "Clarification Endorsement" is silent regarding defense costs, the "New York State Provision" expressly authorizes coverage. Therefore, read in conjunction, the provisions cover defense costs arising in discrimination suits, but not expenses entailed in remedying segregation.

Furthermore, the parties conducted themselves as if the costs were covered. For example, the company initially admitted coverage in its April 1981 letter. Thereafter, the parties conferred regularly and exchanged voluminous correspondence. Continental even audited the Board's legal bills. Four years elapsed without Continental questioning the policy's applicability. Such conduct strongly supports the inference that the parties intended the policy to cover defense costs. *Ocean Transport Line, Inc. v. American Philippine Fiber Industries,* 743 F.2d 85, 91 (2d Cir.1984); *Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 842 (2d Cir.1975).

Finally, Continental challenges the propriety of summary judgment, alleging that a material question remains whether the Board fulfilled its duty of cooperation. The district court held this duty was met as a matter of law by virtue of the extensive contacts between the parties during the pendency of the litigation. We see no reason to disturb that judgment.

Chief Judge Brieant's judgment is affirmed.