In re **DONALD SHELDON & CO., INC.,** Debtor.

**FEDERAL INSURANCE COMPANY,** Plaintiff–Appellee–Cross Appellant,

v.

**Donald T. SHELDON, and Mary Schad, Defendants,**

**Don L. Horowitz, Trustee for the Liquidation of Donald Sheldon & Co., Inc., Defendant–Appellant–Cross Appellee.**

No. 94 Civ. 8336 (LAK).

United States District Court, S.D. New York.

Sept. 6, 1995.

John W. Schryber, Jay G. Strum, Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellant-cross appellee.

Glen Feinberg, Nina Cangiano, Harold J. Moskowitz, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for appellee-cross appellant.

## OPINION

KAPLAN, District Judge.

Mary Schad and Donald Sheldon, both former directors of Debtor Donald Sheldon &

Co. ("DSCO"), were found liable to the Debtor in the amount of $16 million in an adversary proceeding for breaches of their fiduciary duty. The Debtor's Trustee brought a second adversary proceeding against Federal Insurance Company ("Federal") to recover the liability of Sheldon and Schad pursuant to a directors and officers insurance policy on which they were insured persons. Federal denied liability, claiming that the loss was excluded from coverage by Illegal Personal Gain and Dishonesty Adjudication exclusions in the policy.

Bankruptcy Judge Conrad granted summary judgment dismissing the Trustee's claim. He ruled that Federal was not liable because the Illegal Personal Gain exclusion applied, although he found that the Dishonesty Adjudication exclusion did not. These cross-appeals followed, each party challenging the aspect of Judge Conrad's ruling adverse to its interests.

*Facts*

*The Failure of DSCO*

The liability of Sheldon and Schad arose from circumstances that led to DSCO's bankruptcy.

DSCO, a subsidiary of the Donald Sheldon Group, Inc. ("Group"), a holding company, was a broker-dealer in securities. Sheldon was the chairman and president, and Schad was the chief financial officer. Both held Group stock.

As a broker-dealer of securities, DSCO had two principal sources of income—profits on securities sold to customers and interest earned on securities it purchased for its own account. The inventory of securities that DSCO offered to the public was purchased with funds advanced by DSCO's primary lender, Security Pacific. The securities thus acquired were held by Security Pacific in a "clearance loan" account at the bank and constituted the collateral that secured DSCO's obligation to pay the bank the amounts the bank had advanced for the acquisition of the securities plus carrying

charges. Under the terms of the agreement between Security Pacific and DSCO, the bank had the right to call its loan and liquidate any collateral in the clearance loan account if DSCO was in violation of the SEC's net capital rule, 17 C.F.R. § 240.15c3–1 (1994).

DSCO sales personnel solicited sales to the firm's customers of securities held in the clearance loan account. Pursuant to the SEC's customer protection rule,[1] DSCO had 72 hours after receipt of payment from a customer to redeem the purchased securities from Security Pacific's lien by paying Security Pacific the amount Security Pacific paid to buy the security plus interest. DSCO would profit from the transaction to the extent it was able to sell the securities in the clearance loan account for more than the amount it had to pay Security Pacific to redeem them. If securities were not redeemed as required by the customer protection rule, DSCO would be collateralizing its borrowings from hypothecation of customer securities. In the months preceding DSCO's collapse, the firm on at least several occasions failed promptly to redeem customer securities from Security Pacific and was admonished by the National Association of Securities Dealers.

In July 1985, DSCO transferred $4.2 million to Donald Sheldon Government Securities ("GSI"), a troubled Group subsidiary (the "GSI Loan"). (D–35, ¶¶ 65, 97; D–38, ¶ 15)[2] The object of the transaction was to permit GSI to pay off its outstanding debts to Security Pacific and another firm in order to facilitate a merger that, it was hoped, would save GSI. The merger never occurred, however, and GSI went into receivership not long after the loan was made. It was liquidated under Chapter 7 shortly thereafter. DSCO thus was not able to collect on the loan.

At the time DSCO made the GSI Loan, DSCO was thinly capitalized as a result of its aggressive expansion. Although the loan was carried as a receivable on DSCO's books, the intercompany account was not counted for purposes of the net capital rule. As DSCO had a net intercompany payable of

---

**1.** 17 C.F.R. § 240.15c3–3(D)(2) (1994).

**2.** Citations to the Record on Appeal are designated "D–#," referring to the numbered exhibit in the record.

$1.5 million before the GSI Loan, the net effect of the transaction was to reduce DSCO's net capital by $2.7 million. Consequently, DSCO's net capital dropped below $25,000. This triggered a default on DSCO's loan agreement with Security Pacific, which shortly thereafter liquidated the securities it held as collateral.

The liquidation of the collateral did not simply offset DSCO's indebtedness to Pacific. It resulted in a catastrophic loss because many of the securities belonged not to DSCO, but to DSCO's customers. DSCO, and later the Trustee, was liable to its customers for the loss of these securities. The combined losses to DSCO from its unrecoverable loan to GSI and its liability to customers for Pacific's liquidation of securities caused DSCO to liquidate under the Securities Investors Protection Act.

*The SEC Proceeding*

The first action arising from DSCO's failure was brought by the SEC against Sheldon for certain regulatory violations. It focused specifically on DSCO's persistent failure to redeem its customer's securities. An administrative law judge found that Sheldon's behavior was "at least reckless in failing to investigate problems brought to his attention and to keep himself informed of the basic financial information concerning the companies ..." (D–22, at 3–4) The decision was affirmed by the Commission, which emphasized that Sheldon's culpability rested primarily on his lack of involvement in the company. (D–29, at 15)

*The Trustee's Action*

The Trustee subsequently sued Sheldon and Schad for breach of fiduciary duty, alleging that they "knew or should have known" that the GSI Loan would result in violation of the net capital rule and that DSCO had been engaged in illegal hypothecation of fully paid customer securities. (D–35, ¶¶ 5–6) In addition, the Trustee claimed that the loan to GSI violated Sheldon's and Schad's duties of loyalty because they allegedly had personal interests in the transaction by virtue of their ownership of Group stock. The Trustee claimed as damages both the losses described above and the losses caused by the bankrupt-cy itself, including money owed to creditors and loss of goodwill.

The case was tried in the Bankruptcy Court before Judge Conrad and a jury, which returned a general verdict holding both Sheldon and Schad liable to the Trustee and awarding damages against Sheldon in the amount of $9.4 million. Schad, who declared personal bankruptcy after the jury determined liability but before they considered damages, subsequently was found liable for $9.4 million by the Bankruptcy Court.

*This Action and the Decision Below*

The Trustee sued Federal in the Bankruptcy Court to recover on DSCO's directors and officers liability policy the sums owed by Sheldon and Schad as a result of the Trustee's successful action against them.

Federal's policy indemnified Sheldon and Schad for "all Loss ... which [they] bec[ame] legally obligated to pay on account of any claim(s) made against [them] ... for a Wrongful Act ..." (D–23, ¶ 1.1) "Wrongful Act," insofar as is relevant here, was defined as "any ... breach of duty committed ... by any Insured Person ... in the discharge of his duties to the Insured Organization in his Insured Capacity." (*Id.* at 9.1) Sheldon and Schad were Insured Persons under the policy and there is no dispute that they were acting in their Insured Capacity when they breached their fiduciary duties to DSCO. Hence, the liability of Sheldon and Schad to the Trustee is covered unless, as Federal claims, it is excluded under the terms of the policy.

The contract contained two exclusions relevant here:

"[Federal] shall not be liable ... to make any payment for Loss in connection with any claim(s) made against any of the Insured Person(s):

"(D) brought about or contributed to by the dishonesty of such Insured Person if a judgment or other final adjudication adverse to such Insured Person established that the acts of active and deliberate dishonesty were committed or attempted by such Insured Person with actual dishonest purpose and

intent and were material to the cause of action so adjudicated.

"(E) based upon or attributable to such Insured Person having gained any personal profit or advantage to which he was not legally entitled regardless of whether or not (1) a judgment or other final adjudication established that such Insured Person in fact gained such personal profit or other advantage to which he was not entitled, or (2) the Insured Person has entered into a settlement agreement to repay such unentitled personal profit or advantage to the Insured Organization." (*Id.* ¶¶ 3.2(D) & (E))

Federal moved for summary judgment on the theory that the verdict in the Trustee's action against Sheldon and Schad established that the loss for which the Trustee sought recovery was excluded under the Dishonesty Adjudication exclusion (¶ D above). It argued, alternatively, that the loss was attributable to personal profit or advantage illegally obtained by Sheldon and Schad and thus was excluded under the Illegal Personal Gain exclusion (¶ E above).

Judge Conrad, ruling from the bench, held that the Dishonesty Adjudication exclusion did not apply. He said that "having listened to all the evidence, one could come out with a different conclusion that Mary Schad and Donald Sheldon were not dishonest. The jury verdict didn't establish dishonesty. The jury returned a general verdict but didn't specify the basis on which it found the business judgment rule inapplicable." The Court below concluded that dishonesty was not established by the verdict in the Trustee's action because the alternative grounds available to the jury in the charge permitted a finding of liability absent a finding of dishonesty within the meaning of the policy. (D–6, at 36) Judge Conrad, however, did find illegal personal gain to Sheldon and Schad: "Shel-

don and Schad had personal advantage from the use of other people's money. That is what the trials were about." (*Id.* at 37) In consequence, the Bankruptcy Court entered judgment dismissing the Trustee's action against Federal.

The Trustee now challenges the Bankruptcy Court's interpretation of the Illegal Personal Gain exclusion. Federal cross-appeals, challenging the Bankruptcy Court's interpretation of the Dishonesty Adjudication exclusion.

## Discussion
### The Illegal Personal Gain Exclusion

 Despite the fact that DSCO, GSI and Group ultimately lost money as a result of DSCO's illegal hypothecation of customer securities, Federal maintains that Sheldon and Schad reaped personal gain from these activities in the months prior to DSCO's collapse. The illegal hypothecation allegedly sustained DSCO as a viable entity during that period.[3] Sheldon and Schad are said to have obtained advantage from this by (1) remaining employed as corporate officers, (2) retaining the opportunity to expand DSCO, and (3) gaining the opportunity to increase the value of their Group stock in the long term. Federal argues that these gains to Sheldon and Schad, brought about by their status as officers, shareholders and, in the case of Sheldon, a director, constituted illegal personal gain within the meaning of the exclusion.

The Trustee maintains that the gains alleged by Federal did not trigger the Illegal Personal Gain exclusion as a matter of law. Rather, the Trustee interprets the policy to exclude coverage only when the insured gains by causing a loss to the company directly, e.g., by embezzling funds. The exclusion, he argues, does not defeat coverage where an officer or director obtained incidental gains from events that caused a loss to the company.

---

3. Federal points to no evidence that DSCO was kept alive solely by virtue of the illegal hypothecation and that it otherwise would not have been a viable company. Thus, there has been no showing that the alleged gains to Sheldon and Schad in fact were caused by the illegal hypothecation. Given that the Illegal Personal Gain exclusion is an "in fact" exclusion, i.e., it does not turn on a prior adjudication, the failure to establish causation alone would require denial of Federal's motion for summary judgment. However, because the Court concludes that the Trustee is entitled to prevail here on other grounds, this issue need not be determined.

Under New York law, which applies here, exclusionary clauses in insurance contracts are construed strictly to give the interpretation most beneficial to the insured. A construction favorable to the insurer will be sustained only if it is the sole construction that fairly can be placed upon the words employed. *Kimmins Industrial Service Corp. v. Reliance Insurance Co.,* 19 F.3d 78, 81 (2d Cir.1994); *M.H. Lipiner & Son, Inc. v. Hanover Insurance Co.,* 869 F.2d 685, 687 (2d Cir.1989); *Filor, Bullard & Smyth v. Insurance Company of North America,* 605 F.2d 598 (2d Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1506, 59 L.Ed.2d 776 (1978). An insurer claiming that a loss is excluded by a policy term has the burden of demonstrating that the term expressly excludes the loss—exclusions are not extended by interpretation or implication. *McCormick & Co. v. Empire Insurance Group,* 878 F.2d 27, 30 (2d Cir.1989); *Board of Education v. CNA Insurance Co.,* 647 F.Supp. 1495, 1502–03 (S.D.N.Y.1986), *aff'd,* 839 F.2d 14 (2d Cir. 1988); *Seaboard Surety Co. v. Gillette Co.,* 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984); *see Lachs v. Fidelity & Casualty Co. of New York,* 306 N.Y. 357, 365–66, 118 N.E.2d 555, 559 (1954). Here it cannot be said that Federal's construction of the Illegal Personal Gain exclusion is the only one that fairly may be placed upon it.

First, the exclusion states that Federal is not liable for "Loss in connection with any claims ... based upon or attributable to [the insured's] personal profit or advantage." "Loss" is what the insured is legally obligated to pay on the claims against the insured in the underlying action. Thus the exclusion quite readily may be construed to exclude coverage only when the loss is based upon the illegal personal profit or advantage derived by the insured. Here, it is at least reasonably arguable that the alleged personal profits to Sheldon and Schad—their continued employment prior to bankruptcy and an unrealized opportunity to build a corpo-

rate empire—were not the basis of the liability for which recovery was sought. That liability was based on the direct and consequential damages caused by the GSI Loan and the illegal hypothecation of customer securities.

Second, Federal's interpretation of the exclusion is at least somewhat at odds with a fundamental principle of corporate law. Federal argues in substance that gain to shareholders, directors and officers flowing from illegal gain by a corporation in which they have an interest is illegal *personal* gain to those parties. While that is true in a sense, the distinction between a corporation as an entity and its owners and agents generally is an accepted characteristic of corporate law. *See, e.g., Popkin v. Dingman,* 366 F.Supp. 534 (S.D.N.Y.1973); *Robbins v. Panitz,* 61 N.Y.2d 967, 475 N.Y.S.2d 274, 463 N.E.2d 615 (1984); *Reliance Group Holdings, Inc. v. National Union Fire Insurance Co.,* 188 A.D.2d 47, 594 N.Y.S.2d 20 (1st Dep't 1993); *Consolidated Charcoal Co., Inc. v. Tele–Star Media Corp.,* 119 A.D.2d 791, 501 N.Y.S.2d 416 (2d Dep't 1986); Robert Clark, Corporations, § 1.2.3 (1986) (hereinafter "Clark"). It is far from unreasonable to suggest that the Illegal Personal Gain exclusion, in referring to "personal profit or advantage," adverts to something more direct than the sort of derivative benefit upon which Federal's position depends.

As the Illegal Personal Gain exclusion is reasonably susceptible of an interpretation favorable to the insureds, Federal's position is rejected on the basis of familiar principles.

*The Dishonesty Adjudication Exclusion*

The main question with respect to the Dishonesty Adjudication exclusion is how to construe the general verdict.[4] Here, the trial court charged the jury as follows:

"The Business Judgment Rule presumes that Mary Schad and Donald Sheldon have acted properly and in good faith. It means that they may not be held liable unless the

---

4. Federal argued in its brief that the SEC ruling was an adjudication of dishonesty, an argument Federal's counsel did not press at oral argument. The SEC ruling, however, went no further than declaring Sheldon's conduct to be "at least reckless" in failing to monitor his subordinates prop-

erly while his attention was on other matters. Plainly, this ruling did not establish Sheldon's actual dishonest purpose and intent—as required by the exclusion clause—but only his blindness and self-interest. (D–29, at 13–15)

Plaintiff, Trustee here, first shows that Defendants engaged in either self-dealing, fraud or bad faith. In this case, Trustee Horowitz has claimed that Mary Schad and Donald Sheldon acted in bad faith and engaged in self-dealing. Therefore, in order for you to get to consider whether Donald Sheldon and Mary Schad breached their fiduciary duty to DSCO, you must first find that they acted in either bad faith, or engaged in self-dealing.

"Bad faith includes actions and conduct undertaken to mislead or deceive another. Bad faith includes a neglect or refusal to fulfill some duty or contractual obligation not due to an honest mistake, but rather due to some self-interest or sinister motive. Bad faith is not simply bad judgment honestly exercised. Rather, it implies the conscious doing of a wrongful act. It is different from negligence, which implies inattention, because bad faith implies a state of mind affirmatively operating with selfish design or ill will. Thus, one could find, for example, that a company's internal policies and procedures were so restricted in scope, so shallow in execution or otherwise so pro forma or halfheartedly conceived or carried out, that it constitutes bad faith on the part of those responsible.

"Self-dealing includes action undertaken by a fiduciary who uses or obtains the property held in his or her fiduciary capacity for his or her own benefit. (D–26, at 1810–1811)

Thus, the verdict for the Trustee may rest on a finding of self-dealing alone. The charge, moreover, permitted the jury to find self-dealing without finding "active and deliberate dishonesty," which would be necessary to trigger the exclusion.[5]

Federal tacitly concedes as much. It nevertheless argues that the judgment should be construed as having decided the dishonesty issue against Sheldon and Schad as long as the evidence would have permitted a finding of dishonesty, which it asserts was the case here. According to Federal, any other construction would be unfair because an insurer is not in a position to intervene in a proceeding to pose the question of dishonesty to a jury via a special interrogatory. Requiring a specific finding of dishonesty before applying the exclusion thus would leave the question of coverage in the hands of the parties to the case.

Federal's position is entirely without merit. The explicit language of the provision excludes coverage if actively dishonest acts and actual dishonest purpose and intent both are established by adjudication. As the exclusion requires that actual dishonest purpose and intent be "established" by adjudication, the exclusion certainly is susceptible to the interpretation, well developed in the law of collateral estoppel, that the judgment establishes dishonesty under the exclusion only if a finding of dishonesty was necessary to the judgment, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), which in this case it was not. The fact that this interpretation of the exclusion gives the parties to the underlying action some control over the insurer's liability—to the extent that the parties can affect the jury charge and evidence received—is not unfair to insurers. Contracts routinely have conditions of performance contingent on the behavior or conduct of only one of the contracting parties or of strangers to the contract. *See* II E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 8.2, at 345 (1990). The insurance company, which drafts, markets and prices its policies, is capable of ameliorating this risk either through its pricing of the policy or by redrafting the relevant exclusions. In consequence, Judge Conrad correctly held that the Dishonesty Adjudication exclusion does not apply here.

However, the jury charge below did not articulate this possibility in explicit terms. One portion of it emphasizes that "bad faith implies selfish design or ill will." Given the Bankruptcy Court's holding with respect to the self-dealing ground in the charge, this Court need not determine whether the jury was required to find dishonesty pursuant to the bad faith charge.

---

5. The Trustee argues also that the jury did not have to find actual dishonest purpose and intent in order to find bad faith. In many jurisdictions, bad faith for purposes of the business judgment rule need not be premised on malevolence or a culpable mental state; a sufficiently severe lack of judgment caused, for example, by an absence of information, may establish bad faith. *See, e.g., Casey v. Woodruff*, 49 N.Y.S.2d 625, 643 (1944).

## Conclusion

The judgment of the Bankruptcy Court is vacated and this case is remanded for entry of judgment against Federal and in favor of the Trustee.

SO ORDERED.