REQUESTED BY: Senator Stan Schellpeper Nebraska State Legislature
You have requested our opinion on several questions concerning the qualification of the Horsemen's Benevolent and Protective Association ["HBPA"] to conduct licensed horseracing in Nebraska. You state that the Nebraska State Racing Commission ["Commission"] is to consider an application by the HBPA for a license to conduct a live thoroughbred horse race meeting at Fonner Park in 1997. Your questions concern whether the granting of such a license to the HPBA is consistent with various existing statutes governing the conduct of race meetings. If we conclude that it is not, you indicate that you may consider amendatory legislation to address the questions presented.
Initially, you direct our attention to Neb. Rev. Stat. §2-1204 (1991), which sets forth the requirements for applicants seeking a license to conduct horseracing in Nebraska. Section2-1204 provides, in part:
 The State Board of Agriculture, or any county society for the improvement of agriculture organized under section 2-201 or 2-221, or any corporation or association of persons organized and carried on for civic purposes, or which conducts a livestock exposition for the promotion of the livestock or horse-breeding industries of the state, and which does not permit its members to derive personal profit from its activities by way of dividends or otherwise, may apply to the State Racing Commission for a license to conduct horseracing at a designated place within the state. (emphasis added).
Your question is, assuming the HBPA is organized as a nonprofit entity, "does the fact that its members win purses which are generated through its activities violate the provision of this statute which forbids permitting the members of the organization from deriving personal profit from its activities?"
A fundamental principle of statutory construction is to attempt to ascertain legislative intent and to give effect to that intent. County of Lancaster v. Maser, 224 Neb. 566,400 N.W.2d 238 (1987). A statute should be interpreted in such a manner as to give effect to the purpose and intent of the legislature as ascertained from the entire language of the statute in its plain and ordinary sense. NC+ Hybrids v. GrowersSeed Ass'n, 219 Neb. 296, 363 N.W.2d 362 (1985).
An examination of the language of § 2-1204 reveals that the Legislature intended to limit the type of entities which could obtain licenses to conduct horseracing to the following: (1) The State Board of Agriculture; (2) A county society for the improvement of agriculture organized under § 2-201
(county agricultural society) or § 2-221 (county fair); (3) A corporation or organization organized and carried on for civic purposes; or (4) a corporation or association which conducts a livestock exposition for the promotion of the livestock and horse-breeding industries in the state. With respect to these last two classes of entities (corporations or associations organized and carried on for civic purposes, or corporations or associations which conduct livestock or horse-breeding expositions), the Legislature added a further requirement. An entity of this type may be licensed to conduct horseracing only if its members are not permitted "to derive personal profit from its activities by way of dividends or otherwise, . . . ."
The prohibition against an entity of this nature obtaining a license if its members derive "personal profit" from its activities "by way or dividends or otherwise" appears to be intended to ensure that only entities which are "non-profit" in nature are licensed by the Commission to conduct horseracing. The term "dividend", in its usual and ordinary sense, refers to a distribution of earnings or profits to shareholders out of or attributable to a corporation's earnings or profits. Cohen v.Dept. of Revenue, 197 Colo. 385, 593 P.2d 957, 960 (1979); seealso Wright v. United States, 482 F.2d 600, 604 (8th Cir. 1973) (Dividend is "a pro rata distribution out of corporate earnings and profits."). The payment of dividends is, of course, associated with "for-profit" corporations; "non-profit" corporations, by definition, are corporations "no part of the income of which is distributable to its members, directors, or officers." Black's Law Dictionary 953 (5th ed. 1979).
Section 2-1204 not only prohibits personal profit by members through the receipt of "dividends", but expands on the prohibition by precluding personal profit "by way of dividendsor otherwise." (emphasis added). While this language is susceptible of a broad interpretation, it appears that, in the context used, it is meant to prohibit direct monetary gain to members of corporations or associations seeking a license to conduct horseracing. This construction is consistent with the common understanding of a non-profit corporation as one which hinges on "whether the corporation is being exploited for direct monetary gain." People ex rel. Meiresonne v. Arnold,37 Colo. App. 414, 553 P.2d 79, 81 (1976). Moreover, it seems to comport with the Legislature's intent to prohibit members from receiving direct financial gain amounting to "personal profit." Cf. In reDonald Sheldon Co., Inc., 186 B.R. 364, 369 (S.D.N.Y. 1995) (Holding that, under New York law, "personal profit or advantage" under illegal personal gain exclusion in officers' and directors' liability policy required existence of "direct benefit" to officers.).
In light of the foregoing, we cannot say that the HBPA, as a non-profit entity, is definitely precluded from obtaining a license under § 2-1204 because its members may benefit from purses awarded at licensed horserace meetings.[1] The potential for members to receive such purse monies constitutes an indirect, contingent financial benefit which does not appear to fall within the prohibition against direct financial gain to members in §2-1204.[2] As there is, however, some uncertainty concerning the HBPA's qualification for a license under § 2-1204, you may wish to propose amendatory legislation addressing this issue.
You next direct our attention to Neb. Rev. Stat. § 2-1205
(1991), which provides, in part:
 No license [to conduct horse racing] shall be granted to any corporation or association except upon the express condition that it shall not, by any lease, contract, understanding, or arrangement of whatever kind or nature, grant, assign, or turn over to any person, corporation, or association the operation or management of any racing or race meeting licensed under such sections or of the parimutuel system of wagering described in section 2-1207 or in any manner permit any person, corporation, or association other than the licensee to have any share, percentage, or proportion of the money received for admissions to the racing or race meeting or from the operation of the parimutuel system; and any violation of such conditions shall authorize and require the commission immediately to revoke such license.
Your question is whether "this provision prohibit[s] granting a license to the horsemen's organization to use the same facilities which are owned and operated by another organization which has a license to conduct live racing or simulcasting?"
Based on the facts presented in your request, it is our understanding that the HBPA is contemplating seeking a license to conduct a certain number of days of live horse racing in 1997. If such a license is issued, the HBPA would be the licensee conducting its own race meet. As such, it would be responsible for the conduct and operation of the race meeting. While it will no doubt be necessary for the HBPA to enter into some arrangement for the lease or use of horseracing facilities to enable it to conduct a race meeting, this would not be contrary to §2-1205. Section 2-1205 prohibits a licensee from assigning an interest in or turning over the operation and management of thelicensee's race meeting to another person or entity. The lease of such facilities by another licensee (the HBPA) to allow it to conduct a race meeting does not amount to an arrangement whereby the licensee has turned over the operation and management of its race meeting to the HBPA. Rather, the HBPA will be conducting its own separate, independent, race meeting. Thus, we do not believe § 2-1205 has any application in this situation.
You also ask if there is "a conflict between being prohibited from permitting any person, corporation or association other than the licensee from having any share, percentage or proportion of the money received from the operation of the parimutuel system pursuant to this section and receiving a share of the parimutuel wagering for purses pursuant to sections 2-1207.01 and2-1208.04?"
Neb. Rev. Stat. § 2-1207(2) (Cum. Supp. 1996) requires licensees to deduct certain amounts from wagers on horse races "to be used to promote agriculture and horse breeding in Nebraska and for the support and preservation of horseracing pursuant to section 2-1207.01." Section 2-1207.01 provides, in part, that "[t]he amount deducted from wagers pursuant to subsection (2) of section 2-1207 may be used to promote agriculture and horsebreeding in Nebraska and shall be distributed as purse supplements and breeder and stallion awards for Nebraska-bred horses, . . . ." Neb. Rev. Stat. § 2-1208.04(1) (Cum. Supp. 1996), requires the withholding of a portion of gross daily receipts generated from exotic wagers for placement into the Track Distribution Fund. The Fund is distributed to racetracks conducting parimutuel wagering on thoroughbred horseracing "to supplement purses at the track." Neb. Rev. Stat. §2-1208.04(2) (Cum. Supp. 1996).
Arguably, a conflict can be seen between the prohibition in § 2-1205 against "any person, corporation, or association other than the licensee" having "any share, percentage, or proportion of the money received . . . from the operation of the parimutuel system . . .", and the provisions of §§ 2-1207.01
and 2-1208.04, requiring the withholding of receipts from certain wagers to promote agriculture and horsebreeding through purse supplements or breeder and stallion awards for Nebraska-bred horses. Even if these provisions were construed to be conflicting, however, this would not invalidate §§ 2-1207.01
and 2-1208.04. "It is a well-established rule that special provisions of a statute in regard to a particular subject will prevail over general provisions in the same or other statutes so far as there is a conflict." Kibbon v. School Dist. of Omaha,196 Neb. 293, 298-99, 242 N.W.2d 634, 637 (1985). Moreover, "[w]here general and special provisions of statutes are in conflict, the general law yields to the special, without regard to the priority of dates in enacting the same, . . . ." Id.
Thus, even if construed to be conflicting, the special provisions of §§ 2-1207.01 and 2-1208.04 requiring the use of a percentage of certain wagers for specified purposes, would control over the general language in § 2-1205.
Finally, you note that, pursuant to Neb. Rev. Stat. §§2-1243 to 2-1246 (Cum. Supp. 1996), certain rights are granted to "horseracing industry participants." "Horseracing industry participant" is defined to "mean an individual who currently holds a license from the State Racing Commission and who owns, trains, cares for, or rides horses stabled at a Nebraska-licensed racetrack for the purposes of horseracing at the live race meeting at such racetrack." Neb. Rev. Stat. § 2-1244 (Cum. Supp. 1996). Under § 2-1245, horseracing industry participants are entitled to certain rights, including "reasonable treatment from those licensed to conduct thoroughbred race meets." Neb. Rev. Stat. § 2-1245(1) (Cum. Supp. 1996). Your question is as follows:
 If the HBPA holds the license to conduct racing, is it in the same position as any other licensee and therefore restricted from taking any of the actions outlined in that section with regard to its membership, or does it have another relationship because of the fact that its members are composed of horseracing industry participants, and, if so, are there potential conflicts of interest in relation to the statute because of its position as representative of both the track and the horseracing industry participant?
If the HBPA is acting as a licensee conducting a horse race meeting, it is subject to the provisions of § 2-1245 in relation to horseracing industry participants, to the same extent as any other licensee. If, as you suggest, this may create potential conflicts or inconsistencies by virtue of the HBPA's status as a representative of the horseracing industry on behalf of its members, you may wish to consider amendatory legislation dealing with this issue.
Very truly yours,
 DON STENBERG Attorney General
 L. Jay Bartel Assistant Attorney General
cc: Patrick J. O'Donnell Clerk of the Legislature
APPROVED BY:
Don Stenberg
DON STENBERG, Attorney General
[1] While you have not raised the issue, we note that the HBPA, as it is not an organization organized and carried on for "civic purposes", would have to conduct a "livestock exposition for the promotion of the livestock or horse-breeding industries in the state" in order to qualify for a license under § 2-1204.
[2] To the extent the Commission believes potential conflicts of interest are presented by licensing an organization such as the HBPA, it may exercise its authority to promulgate rules and regulations prohibiting such conflicts under Neb. Rev. Stat. § 2-1219(6) (1991).