OPINION OF THE COURT
Charles E. Ramos, J.
In this insurance coverage action, plaintiffs[1] seek a declaration that their insurers are required to indemnify them for claims stemming from Bear Stearns’ monetary settlement of Securities and Exchange Commission (SEC) and New York Stock Exchange (NYSE) regulatory proceedings and related private litigation predicated on allegations that Bear Stearns facilitated its customers’ deceptive market timing and late trading activities.
In motion sequence 17, Bear Stearns moves, pursuant to CPLR 3212, for an order granting partial summary judgment in its favor dismissing the defenses in which defendants contend that (1) Bear Stearns breached the insurance policy conditions requiring it to obtain defendants’ consent to settle; and (2) Bear Stearns breached its duty to cooperate.
*696 Defendants Vigilant Insurance Company, The Travelers Indemnity Company, Federal Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., Liberty Mutual Insurance Company, Certain Underwriters at Lloyd’s, London and American Alternative Insurance Corporation (the insurers) cross-move, pursuant to CPLR 3212, for an order granting summary judgment in their favor, dismissing the complaint.
For a full recitation of the factual and procedural background in this action, see J.P. Morgan Sec. Inc. v Vigilant Ins. Co. (2010 NY Slip Op 33799[U] [Sup Ct, NY County 2010, Ramos, J.], revd 91 AD3d 226 [1st Dept 2011], revd 21 NY3d 324 [2013]).
In support of its motion, Bear Stearns argues that New York law is clear that where, as here, an insurer denies liability, the insured is free to enter into a reasonable settlement without obtaining the insurer’s consent. Bear Stearns argues that the investigation demands made by the SEC, NYSE and other regulatory governmental bodies plainly constituted a “claim;” which was broadly defined in the policy to include “any investigation into possible violations of law or regulation initiated” by regulators “against an Insured for any Wrongful Act.”
Bear Stearns also contends that it duly reported the regulatory investigation demands within the policy period, and that the insurers rejected the notice and any basis for coverage on the ground that the regulatory proceedings did not constitute a claim within the meaning of the policies. Bear Stearns highlights that the insurers also took the position that disgorgement payments to the SEC, such as the one the SEC was demanding of Bear Stearns, was not insurable as a matter of law. Nonetheless, Bear Stearns alleges that it did seek the insurers’ consent long before reaching any settlement with the SEC, and, in any event, the policy prohibited the insurers from unreasonably withholding such consent, as they did here.
Bear Stearns argues that the insurers’ defense based upon its alleged violation of the cooperation clause in the policy should be dismissed for similar reasons.
In opposition to Bear Stearns’ motion and in support of their cross motion for summary judgment, the insurers maintain that the settlement that Bear Stearns entered into with the SEC in 2006 is not insurable because Bear Stearns failed to obtain their consent to that settlement, and because it failed to cooperate and provide the insurers with even the most basic *697 information about the defense and settlement of the SEC’s charges — information that the insurers reasonably requested and needed in order to evaluate the claims, defenses and proposed settlement of the SEC investigation. The insurers allege that the record contains ample evidence that the insurers repeatedly asked for information regarding the defense and settlement of the SEC investigation. Finally, the insurers assert that Bear Stearns was not excused from its obligations to cooperate and to obtain the insurers’ consent, and in any event, their refusal to consent to the settlement was reasonable.
Discussion
With respect to consent to settle, section VI of the primary policy states,
“The Insured agrees not to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim in excess of a settlement authority threshold of $5,000,000 without the Insurer’s consent, which shall not be unreasonably withheld. The Insured shall have the right to select its own legal defense counsel, subject to the approval of Insurers which shall not be unreasonably withheld.”
The primary policy states, with respect to cooperation, “The Insured agrees to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agrees that in the event of a Claim the Insured will do nothing that may prejudice the Insurer’s position or its potential or actual rights of recovery.”
The consent-to-settle provision quoted above is a condition precedent to coverage, and an insured’s failure to comply with its obligations under an insurance policy is generally a defense to an action on the policy (American Ref-Fuel Co. of Hempstead v Resource Recycling, 281 AD2d 573, 574 [2d Dept 2001]). Nonetheless, the repudiation of liability by an insurer on the ground that the loss is not covered by the policy will excuse an insured from complying with the term of the policy obligating it to obtain the insurers’ consent before settlement of any matter, provided that the settlement is reasonable (Matter of Vanguard Ins. Co. [Polchlopek], 18 NY2d 376 [1966]; Isadore Rosen & Sons v Security Mut. Ins. Co. of N.Y., 31 NY2d 342, 347-348 [1972]; AJ Contr. Co. v Forest Datacom Servs., *698 309 AD2d 616, 617-618 [1st Dept 2003]; American Ref-Fuel Co. of Hempstead, 281 AD2d at 574). If the insurer does not establish that the loss falls squarely within a policy exclusion as claimed or otherwise does not constitute a covered loss, the insured is excused from further compliance with its obligations under the policy (id.). “[A]n insurer declines coverage at its own risk” (Park Place Entertainment Corp. v Transcontinental Ins. Co., 225 F Supp 2d 406, 413 [SD NY 2002]).
Here, Bear Stearns cites to evidence in the record to establish that the insurers effectively disclaimed coverage prior to Bear Stearns’ settlement with the SEC. The insurers consistently asserted, from the inception of the regulatory investigations, that those investigations did not appear to constitute a claim.
In March 2004, Chubb notified Bear Stearns that it “does not appear that a Claim has been made” with respect to the regulatory demands, but acknowledged the existence of a potential claim with respect to the Pflugrath complaint[2] (exhibits 47-48, 54 annexed to Morris aff). In March, October and November 2005, and April 2006 letters, the insurers consistently communicated their position that the information provided by Bear Stearns with respect to the regulatory investigations did not appear to establish the existence of a claim under the policy (exhibits 3, 7, 9 annexed to Taub aff).
Further, the insurers consistently communicated their position that, even if the regulatory investigations did constitute a claim, the losses would not be insurable under the policies because disgorgement claims are categorically uninsurable (exhibits 2-3, 8, 11 annexed to Taub aff).
Chubb and Gulf Insurance Company even brought a declaratory judgment action against Bear Stearns involving the same policies at issue in the present coverage action (research analyst action). In the research analyst action, the insurers sought a declaration that payments to the SEC by Bear Stearns in connection with the SEC’s investigation of research analysts’ conflict of interest were uninsurable because they were disgorgement, and thus, uninsurable as a matter of law.
None of the insurers expressed any difference of opinion and consistently took the position that Bear Stearns did not *699 establish that the SEC, even after it served a Wells notice on Bear Stearns, had asserted a claim, and that it was un-insurable in any event (see Bear Stearns rule 19-A statement ¶ 99). On the basis of the foregoing, the insurers all rejected Bear Stearns’ request for their consent to settle its proposed settlement with the SEC (exhibits 10-11, 13 annexed to Taub aff).
The SEC and NYSE investigations were undeniably a “claim” under the policy, defined as “any investigation into possible violations of law or regulation initiated by any governmental body or self-regulatory organization.”[3] Between September and November .2003, Bear Stearns received eight demands for information from the SEC, five from the NYSE and a subpoena from the New York Attorney General pertaining to its alleged conduct with respect to processing market timing and late trading (Bear Stearns rule 19-A statement ¶¶ 30, 38, 40, 43, 60-61).
On February 20, 2004, multiple class actions involving allegations similar to those of the Pflugrath complaint were consolidated for proceedings in the United States District Court for the District of Maryland (exhibit 38 annexed to Morris aff). Bear Stearns forwarded the regulators’ subpoenas and other information demands to the insurers beginning in October 2003. In November 2004, Bear Stearns notified the insurers of the 13 class action complaints which had been served on Bear Stearns, and that it received a Wells notice from the SEC (exhibits 39, 59 annexed to Morris aff).
The NYSE and SEC demands and the Pflugrath complaint constituted a claim under the policies because they furthered the SEC and NYSE investigations into possible violations of law. In correspondence sent to the insurers in October 2003 and updated in December 2003, Bear Stearns purported to report a claim under the policies of all the subpoenas, demands *700 and the Pflugrath complaint that it had received through November 20, 2003 (Bear Stearns rule 19-A statement ¶¶ 60-61). The insurers do not dispute that Bear Stearns sent a letter informing them that a claim had been made against it (see insurers’ response to Bear Stearns rule 19-A statement ¶¶ 60-61).
The insurers did not respond until March 24, 2004, when Howard Veisz, writing on behalf of Chubb, stated that the information Bear Stearns supplied with respect to the SEC investigation did not establish that a claim had been made against Bear Stearns, and denied that the regulatory investigations constituted a claim, or even that Bear Stearns had satisfied the notice requirement (Bear Stearns rule 19-A statement ¶¶ 69, 72). Bear Stearns advised the insurers in a call on November 17, 2004 that Bear Stearns had received a Wells notice from the SEC and that it was prepared to offer $40 million to settle the regulatory investigation (Bear Stearns rule 19-A statement ¶ 74).
At that time, the insurers did not advise Bear Stearns not to make such an offer (insurers’ rule 19-A counterstatement ¶ 74). On March 23, 2005, Veisz indicated that a Wells notice “indicates that there has yet to be a Claim” (Bear Stearns rule 19-A statement ¶ 80). Bear Stearns requested the insurers’ consent to settle in letters and conference calls between September and November 2005 (Bear Stearns rule 19-A statement ¶¶ 86, 88, 95). On November 3, 2005, Veisz stated that Bear Stearns had never established that the SEC asserted a claim prior to the expiration of the applicable reporting period, and declared that fines and disgorgement are uninsurable, which position was echoed by Liberty, in a letter dated December 5, 2005 (Bear Stearns rule 19-A statement ¶¶ 97, 99, 100).
Bear Stearns settled with the SEC on March 16, 2006 for $160 million (Bear Stearns rule 19-A statement ¶ 105). Bear Stearns ultimately settled the civil actions for $14 million.
At this point in the litigation, the insurers no longer contest the assertion that the claims for which Bear Stearns sought coverage were made and reported during the applicable policy period (insurers’ response to Bear Stearns rule 19-A statement ¶ 131). In any event, Bear Stearns’ notice within the applicable policy period of the Pflugrath complaint, which the insurers *701 acknowledged to be a claim, brought within coverage any interrelated claim.[4]
The Pflugrath complaint focuses on the same alleged conduct by Bear Stearns in facilitating deceptive market timing and late trading in mutual funds that are the subject of all of the regulatory investigations and civil actions against Bear Stearns, and are clearly interrelated.
Further, there is no question that the insurers took the position that, even if there was a claim, it would not be insurable because disgorgement claims are categorically uninsurable (compare Bear Stearns rule 19-A statement ¶ 115, with insurers’ response ¶¶ 115, 120, 122-123, 125, 128-129), and thus, unequivocally denied coverage.
The court concludes that there is no triable issue that the insurers effectively disclaimed coverage prior to Bear Stearns’ settlement with the SEC, which excused Bear Stearns from complying with that term of the policies obligating it to obtain the insurers’ consent before settlement of any matter (Isadore Rosen & Sons, 31 NY2d at 347-348; AJ Contr. Co., 309 AD2d at 617-618; American Ref-Fuel Co. of Hempstead, 281 AD2d at 574). Moreover, the insurers fail to demonstrate that the SEC and NYSE regulatory investigations did not constitute a claim under the policies. Thus, under prevailing case law, Bear Stearns was excused from the obligation to obtain the insurers’ consent prior to settlement, and was entitled to enter into a reasonable settlement based upon the terms of the policies themselves.[5]
The insurers take the position that they never conclusively denied coverage with respect to the regulatory investigations *702 because in their communications with Bear Stearns, they always reserved their rights and advised that their determination was non-final unless and until Bear Stearns provided certain information. However, notwithstanding that the letters contained boilerplate “reservation of rights” language, the insurers’ other statements left no doubt that they were disclaiming coverage on the grounds that Bear Stearns did not notice a claim, and that even if there was a claim, it was uninsurable as a matter of law (see QBE Ins. Corp. v Jinx-Proof Inc., 22 NY3d 1105 [2014]).
With respect to the Pflugrath complaint, Bear Stearns sought the insurers’ consent to settle the civil class actions in September 2007; the insurers denied consent in a letter that same month (Bear Stearns rule 19-A statement ¶ 107). Although the court determines that the insurers fail to raise a triable issue that they have a valid defense based upon Bear Stearns’ failure to obtain their consent prior to settling with the SEC and the Pflugrath action, the court cannot determine at this juncture whether the settlements entered into were reasonable, which is a fact-laden inquiry, ill-suited for summary disposition.
With respect to the cooperation clause, under Thrasher v United States Liab. Ins. Co. (19 NY2d 159, 168 [1967]), the “burden of proving lack of co-operation of the insured is placed upon the insurer,” and it is a heavy burden. The insurer “must demonstrate that it acted diligently in seeking to bring about the insured’s co-operation; that the efforts employed by the insurer were reasonably calculated to obtain the insured’s cooperation; and that the attitude of the insured, after his cooperation was sought, was one of ‘willful and avowed obstruction’ ” (id. [citations omitted]). As with the consent to settle requirement, an insurer also releases its insured from the duty to cooperate by denying coverage or taking measures that render cooperation futile (id.).
There is no contention on the part of the insurers that Bear Stearns failed to give timely notice of the claims (insurers’ response to Bear Stearns rule 19-A statement ¶ 131). Otherwise, the insurers do not cite to any acts or omissions on the part of Bear Stearns on which this court could make a finding of noncooperation, or of willful failure to cooperate.
The insurers’ own expert states that “Bear Stearns eventually offered the Insurers access to all of the evidentiary documents produced to the SEC,” but that nonetheless, the insurers *703 were entitled to receive “more meaningful information” (Bailey aff, exhibit 1 at 6-7). It is not at all clear what additional meaningful information Bear Stearns could have provided; however, there is no evidence that Bear Stearns obstructed the insurers’ efforts to obtain cooperation, and non-action in itself is not evidence of a lack of cooperation (see Matter of Empire Mut. Ins. Co. [Stroud—Boston Old Colony Ins. Co.], 36 NY2d 719, 721-722 [1975]; see also City of New York v Continental Cas. Co., 27 AD3d 28, 31-32 [1st Dept 2005]).
In any event, there is no doubt that the insurers have failed to meet their heavy burden that they diligently sought Bear Stearns’ cooperation, or that Bear Stearns willfully obstructed these efforts.
Accordingly, it is ordered that plaintiffs’ motion for an order granting partial summary judgment is granted to the extent that the defense in which defendants contend that Bear Stearns breached its duty to cooperate is dismissed, and the defense in which defendants contend that Bear Stearns’ settlement terms were unreasonable is denied, in part; and it is further ordered that defendants’ cross motion for an order granting summary judgment in their favor is denied in its entirety.

. Plaintiffs are J.P. Morgan Securities Inc., formerly known as Bear, Stearns & Co. Inc., and J.P. Morgan Clearing Corp., formerly known as Bear Stearns Securities Corporation, and The Bear Stearns Companies LLC, formerly known as The Bear Stearns Companies Inc. (TBSC) (together, Bear Stearns). In 2008, TBSC, through its merger with a subsidiary of JPMorgan Chase & Co., became a subsidiary of JPMorgan Chase & Co.

. On November 7, 2003, Bear Stearns was served with a putative class action complaint filed in the United States District Court for the Southern District of New York, which dealt with allegations that Bear Stearns facilitated late trading and deceptive market timing in mutual funds by its clients, thus harming investors (Pflugrath complaint; exhibit 37 annexed to Morris aff).

. The policies define claims in section II (I):
“(1) a civil proceeding commenced by the service of a complaint or similar pleading,
“(2) any investigation into possible' violations of law or regulation initiated by any governmental body or self-regulatory organization (SRO), or any proceeding commenced by the filing of a notice of charges, or formal investigative order or similar document, or “(3) a written demand;
“against an Insured for any Wrongful Act, including any appeal therefrom.”

. The primary policy required Vigilant to “pay all Loss in excess of the Retention . . . up to the Limit of Liability” (exhibit 8 annexed to Morris aff, § V [A]). Section V (B) of the policies also state that
“[c]laim(s) involving the same Wrongful Act or interrelated Wrongful Acts of one or more of the Insured(s) shall be considered a single Loss and only Retention shall be applied to each such single Loss; provided, however, that the earliest Claim(s) arising out of such Wrongful Act or interrelated Wrongful Acts is first made during the Policy Period” (exhibit 8 annexed to Morris afí).

. The policies include a provision which states: “The Insured agrees not to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim in excess of a settlement authority threshold of $5,000,000 without the Insurer’s consent, which shall not be unreasonably withheld” (exhibit 8 annexed to Morris aff, § VI).