J.P. Morgan Securities Inc., J.P. Morgan Clearing Corp., and the Bear Stearns Companies LLC, Plaintiffs,

against
Vigilant Insurance Company, the Travelers Indemnity Company, Federal Insurance Company, National Union Fire Insurance Company of Pittsburgh, P.A., Liberty Mutual Insurance Company, Certain Underwriters at Lloyd's, London and American Alternative Insurance Corporation, Defendants.


600979/09

For plaintiffs: Steven Obus, Esq., Proskauer Rose LLP
For defendant Vigilant Ins. Co.: Joseph Finnerty, Esq., DLA Piper LLP


Charles E. Ramos, J.

In this insurance coverage action, plaintiffs [FN1]
(together, plaintiffs) seek a declaration that its insurers are required to indemnify it for claims stemming from Bear Stearns' monetary settlement of Securities and Exchange Commission (SEC) and New York Stock Exchange (NYSE) investigations and related private litigation arising out of Bear Stearns' alleged facilitation of late trading and deceptive market timing.
In motion sequence 018, defendant National Union Fire Insurance Company of Pittsburgh, Pa. (National Union) moves for partial summary judgment declaring that there is no coverage for plaintiffs' claims asserted under National Union Excess Professional Liability Policy No. 278-73-26 on the basis that all such claims for coverage are barred by the policy's known wrongful acts exclusion. Plaintiffs cross-move for partial summary judgment dismissing National Union's defense based upon this exclusion.
In motion sequence 019, plaintiffs move for summary judgment dismissing defendants' defenses that 1) $140 million of the loss for which Bear Stearns claims coverage is uninsurable as ill-gotten gains; 2) the loss is otherwise excluded under the Personal Profit Exclusion; 3) public policy bars indemnification; and 4) the amounts Bear Stearns paid to settle the claims against it were unreasonable.
In motion sequence 020, defendants Vigilant Insurance Company (Vigilant), The Travelers Indemnity Company (Travelers), Federal Insurance Company (Federal), National Union, Liberty Mutual Insurance Company (Liberty), Certain Underwriters at Lloyd's, London (Lloyds), and American Alternative Insurance Company (AAIC) (together, the Insurers) move for summary judgment in their favor.
In motion sequence 021, Lloyd's and AAIC (together, the Underwriters) move for summary judgment dismissing all claims asserted against them under Lloyd's excess policy under the known wrongful acts exclusion.
In motion sequence 022, plaintiffs move for partial summary judgment dismissing the Underwriters' defense under the known wrongful act exclusions.
In motion sequence 023, plaintiffs move to supplement the record on the Insurers' pending motion for summary judgment (020).
Motion sequence numbers 018 through 023 are consolidated for disposition.
Background [FN2]

In 2003, Bear Stearns subsidiaries, BS & Co., a registered broker-dealer, and BSSCorp., a clearing firm, were the subject of investigations conducted by the SEC and NYSE for possible violations of federal securities law in connection with their alleged facilitation of late trading and deceptive market timing by certain customers involved in buying and selling shares in various mutual funds.[FN3]

At the conclusion of its investigation, the SEC notified Bear Sterns of its intention to formally charge it with violations of federal securities law, to seek injunctive relief and sanctions of $720 million. Bear Stearns disputed the proposed charges in a Wells Submission, and entered into settlement negotiations with the SEC. On March 16, 2006, pursuant to a Bear Stearns offer of settlement and without any admission by Bear Stearns of the SEC's findings, the SEC issued an order resolving its investigation (SEC order). To resolve the SEC claims, Bear Stearns agreed to pay a total of $250 million, of which $160 million was labeled "disgorgement" and $90 million was a penalty, in order to provide compensation to mutual fund investors for the alleged damages caused by late trade and deceptive market timing practices of Bear Stearns' customers. Bear Stearns also entered into a settlement with the NYSE, which imposed a disgorgement and penalty payment identical to that imposed by the SEC, deemed satisfied by Bear Stearns' tender of payment to the SEC (Plaintiffs' Response to Insurers' Rule 19-A Statements, ¶ 29).
Bear Stearns was also named as a defendant in thirteen civil class actions (civil actions), commenced on behalf of mutual fund investors allegedly damaged by Bear Stearns' conduct. [*2]Bear Stearns ultimately agreed to pay $14 million to settle the civil actions.
Bear Stearns has sought indemnity from the Insurers under an insurance program which provided professional liability insurance coverage to Bear Stearns and its subsidiaries, directors, officers and employees. The insurance program provided Bear Stearns with $200 million in coverage, above a $10 million retention. The Insurers disclaimed coverage on the ground that the settlement constituted disgorgement of ill-gotten gains which are not insurable as a matter of law.
Thereafter, plaintiffs commenced this insurance coverage action seeking a declaration that the Insurers are obligated to indemnify Bear Stearns for the non-penalty portion of the SEC settlement (less a $10 million retention), plus defense costs and pre-judgment interest. Bear Stearns also seeks a declaration for entitlement to coverage arising out of its payment of $14 million to settle the civil actions. In their answers, the Insurers maintain that Bear Stearns' claims for coverage are barred under exclusions contained in the Policies and violate public policy.
Previously, Insurers sought dismissal of the complaint pursuant to CPLR 3211, which this court denied in 2010 (J.P. Morgan Securities Inc. v Vigilant Ins. Co., 2010 NY Slip Op 33799[U] [Sup Ct, NY County 2010]). The First Department reversed this Court's denial of the Insurers' motion to dismiss the complaint (J.P. Morgan Securities Inc. v Vigilant Ins. Co., 91 AD3d 226 [1st Dept 2011]). In June 2013, the Court of Appeals reversed the First Department, and reinstated this Court's decision (21 NY3d 324 [2013]).
In 2014, this Court addressed defenses based upon the applicability of the dishonest acts exclusion in plaintiffs' motion for partial summary judgment. This Court granted the motion and dismissed the affirmative defenses based upon the exclusion, holding that Bear Stearns' settlements with the regulatory agencies did not constitute adjudications of wrongdoing (42 Misc 3d 1230[A]]).
In July 2016, plaintiffs moved for partial summary judgment dismissing certain Insurers' defenses based upon assertions that Bear Stearns failed to obtain the Insurers' consent to settle and breached the duty of cooperation; several Insurers cross-moved for summary judgment. With respect to the obligation to obtain the Insurers' consent to settle, this Court held that Bear Stearns was excused from complying because the Insurers effectively disclaimed coverage prior to Bear Stearns' settlement with the SEC (53 Misc 3d 694). With respect to the duty to cooperate, this Court held that the Insurers' failed to meet their burden that they diligently sought Bear Stearns' cooperation or that Bear Stearns obstructed these efforts (Id.). 
Discussion
I. Defenses Common to All Insurers
Plaintiffs move for summary judgment to dismiss the Insurers' remaining defenses on the grounds that Bear Stearns is entitled to coverage for the $140 million disgorgement payment because it is undisputed that this payment represents the profits of third parties and not Bear Stearns, and it suffered an insurable loss under the Policies.
In opposition to plaintiffs' motion and in support of their own motions for dismissal, the Insurers argue that plaintiffs cannot demonstrate that the SEC ordered Bear Stearns to disgorge its customers' ill-gotten gains as opposed to its own ill-gotten gains. The Insurers additionally argue that, irrespective of whether Bear Stearns can establish that it was in fact ordered to disgorge only its customers' ill-gotten gains, the $140 million payment is not insurable because it was not a loss under the Policies.
As stated by the Court of Appeals previously in this action, under both public policy [*3]grounds and insurance contract interpretation principles, "the return of improperly acquired funds does not constitute a 'loss' or 'damages' within the meaning of insurance policies (J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 335-36 [2013]). Thus, an insured will be barred from obtaining coverage for a settlement payment made to a regulatory body that is labeled disgorgement where the regulatory body's findings "conclusively link the disgorgement payment to improperly acquired funds in the hands of the insured" (Millennium Partners, L.P. v Select Ins. Co., 68 AD3d 420 [1st Dept 2009], appeal dismissed 14 NY3d 856 [2010]).
Here, the Policies' definition of loss is broad. The definition lists both "damages" and "other costs" that the insured is legally obligated to pay. It covers "compensatory damages, multiplied damages, punitive damages where insurable by law, judgments, settlements, costs, charges and expenses or other sums the Insured shall legally become obligated to pay as damages resulting from any Claim," and "costs, charges and expenses or other damages incurred in connection with any investigation by any governmental body or self-regulatory organization" (Exhibit 8, § II.B, annexed to the Siegelaub Aff.).
Based on a plain reading of this term, the $140 million disgorgement payment that Bear Stearns made to settle the SEC's late trading and market timing claims clearly constitutes a loss as damages resulting from a claim, provided that this payment represented the gains of third parties and not Bear Stearns. As noted by the Court of Appeals, the SEC order does not establish that the $140 million payment, although labeled disgorgement, was predicated on profits that Bear Stearns improperly acquired (J.P. Morgan Sec. Inc., 21 NY3d at 336). Indeed, the SEC order emphasized that Bear Stearns facilitated and enabled its customers, through Bear Stearns' provision of clearing services, to receive millions of dollars of improperly acquired gains. The SEC order makes no mention of Bear Stearns' having improperly earned revenue as a result of its facilitation of such trading practices.
Notwithstanding the lack of a conclusive link in the SEC order between the disgorgement payment and any improperly acquired funds in the hands of Bear Stearns, plaintiffs go further by submitting extensive evidence to demonstrate that the settlement payment it made to the SEC actually represents the gains of its customers, rather than its own gains. For the reasons set forth below, the Insurers fail to rebut this showing with any competent evidence.
To demonstrate that the settlement payment they are seeking insurance coverage for is not ill-gotten gains, plaintiffs submit the testimony and contemporaneous notes of Lewis Liman, Esq., of Cleary Gottlieb Steen & Hamilton LLP (Clearly Gottlieb) who represented Bear Stearns in its defense of the regulatory investigations.
Further, plaintiffs point to documents that Bear Stearns produced in response to an April 2004 SEC subpoena, which requested the production of documents sufficient to show Bear Stearns' own profit or loss for those who placed late trading and market timing trades through Bear Stearns, in addition to any related revenue received by Bear Stearns for such trades (Exhibit 30, annexed to the Siegelaub Aff.). In response to this subpoena, Bear Stearns performed calculations - which it presented to SEC staff - of the revenues Bear Stearns had earned from these accounts and customers it had identified as potentially engaging in deceptive market timing and late trading (Exhibit 39, annexed to the Siegelaub Aff.).
In addition, according to Liman's unequivocal testimony of his firsthand discussions with SEC staff on behalf of Bear Stearns, coupled with the testimony of other witnesses, following the production of documents pursuant to the subpoena, both the SEC and Bear Stearns engaged in a process of identifying the universe of customers who may have been engaged in late trading and [*4]market timing, in order to calculate both Bear Stearns' revenues and the profits earned by Bear Stearns' customers engaged in market timing and late trading. To this end, Bear Stearns prepared a "Combined Accounts List" which it presented to the SEC in December 2004 (Exhibits 41-44, 82, Moreno Dep Tr 304, annexed to the Siegelaub Aff.).
The Combined Accounts List identified correspondent broker-dealer accounts that the documents and trading data identified may have employed a market timing strategy (Id.). The Combined Accounts List also included an analysis of Bear Stearns revenues from mutual fund trades in these accounts, which showed that Bear Stearns' revenues from the mutual funds transactions in the accounts the SEC determined were associated with late trading and deceptive market timing totaled $16.9 million (Liman Aff., Exhibit A, ¶ 4; Exhibits 46, annexed to the Siegelaub Aff.). The SEC staff accepted this revenue calculation, which became the basis of the discussions between Bear Stearns and SEC staff with respect to that component of the investigation (see Liman Aff., ¶ 6; Liman Dep Tr 295-97, 822:5-11, Exhibits 81, annexed to the Siegelaub Aff.).
SEC staff also requested the production of customer gain information, based upon the understanding, from Bear Stearns' perspective, that Bear Stearns should be held liable through disgorgement for the gains of its customers. Similarly, where there was a broker/customer relationship, it was understood from communications with SEC staff that a clearing broker should be liable for its own profits and also for the profits of the brokers' customers (Exhibit 81, annexed to the Siegelaub Aff.; (Liman Dep Tr 170-71, 173:5-16, 174:22-25, 175:12-18, 243:10-24-244:2-15). Liman testified that SEC staff informed him that it was interested in the fees and revenues ascribed to those customers that were engaged in deceptive market timing and was not interested in the clearing fees as a whole generated by Bear Stearns' relationship with the particular correspondent broker-dealer (Liman Dep 150).
At the request of SEC staff, Bear Stearns estimated the gains of its customers achieved through market timing and late trading by employing both a "Delta NAV" analysis [FN4]
and a holding period realized gain/loss analysis,[FN5]
both of which were submitted to the SEC in December 2004 and January 2005 (Exhibits 48-49, Zitzewitz Dep Tr 59:10-16, 60:2-12, annexed to the Siegelaub Aff.; Liman Aff. A, ¶ 7). The Delta NAV analysis produced a total estimated customer gain for the accounts to which it was applied of $519 million (Liman Aff., Exhibit A, ¶ 7; Exhibits 48-49 annexed to the Siegelaub Aff.). The holding period realized gain/loss analysis produced a total estimated customer gain for the accounts to which it was applied of $306 million.
Subsequent to Bear Stearns' presentation of the Combined Accounts List, the SEC informed Bear Stearns that it was prepared to recommend that an enforcement action be brought against Bear Stearns seeking $520 million in disgorgement and $200 million in penalty (Liman Aff., Exhibit A, ¶ 8; Exhibits 44, 50 annexed to the Siegelaub Aff.).
In March 2005, Bear Stearns submitted a Wells Submission to the SEC; Bear Stearns proposed to settle the investigation by paying $40 million (Liman Aff. A, ¶ 8; Exhibit 50, annexed to the Siegelaub Aff.). According to Liman, the large difference between the SEC's plan to seek a total of $720 million in monetary relief and Bear Stearn's $40 million settlement offer is because the SEC used the Delta NAV methodology (Liman Aff. A, ¶ 8).
In response to the SEC staff's claim that Bear Stearns' customers had achieved $520 million in gains, counsel for Bear Stearns submitted a detailed, alternative calculation estimating the gains of its late trading and market timing customers using a "fair value" methodology, which measured estimated gains by comparing the prices at which late traders executed their trades with the estimated fair value of the relevant securities based on future index prices (Liman Aff., Exhibit A, ¶ 9; Exhibit 51, annexed to the Siegelaub Aff.). Under the fair value analysis, Bear Stearns calculated that its customers' gains were $140 million (Exhibit 83, annexed to the Siegelaub Aff.).
According to Liman's testimony and his contemporaneous hand-written notes, SEC staff advised Bear Stearns in June 2005 that it accepted the $140 million figure that Bear Stearns presented, and was prepared to recommend a settlement in which Bear Stearns would pay $250 million, including a $90 million penalty and $160 million of disgorgement, $140 million of which represented the gains achieved by Bear Stearns' customers, under the fair value methodology (Liman Aff. A, ¶¶ 5, 10; Liman Dep Tr 657-58, 775-76; Plaintiffs' Rule 19-A Statements, ¶¶ 60-67).
Bear Stearns submitted its final settlement offer to the SEC. On March 16, 2006, the SEC investigation was resolved by settlement and the entry of the SEC order, which required Bear Stearns to pay $90 million as a penalty and $160 million labeled as disgorgement (Exhibits 23, 26 annexed to the Siegelaub Aff.).
Over the course of seven years of litigation, plaintiffs have fully disclosed the substance of Bear Stearn's communications and negotiations with the SEC, which they have presented in support of their motion for summary judgment. The Insurers dispute, in conclusory fashion, that any of this evidence reflects how the SEC arrived at the $160 million disgorgement component, because the SEC did not publish explicit findings to this effect (Insurers' Counter-statement, Rule 19-A Statement, ¶ 67). However, the absence of specific language in the SEC order as to the breakdown of the $160 million payment does not, as a matter of law, preclude coverage (see J.P. Morgan Sec. Inc., 21 NY3d at 336), where the documentary and testamentary evidence largely and overwhelmingly supports the conclusion that Bear Stearns' misconduct enabled its customers to generate millions of dollars in profits rather than its own ill-gotten gains.
Finally, despite uniformly disputing most of plaintiffs' evidence (Insurers' Response to Plaintiffs' Rule 10-A Statement, ¶ 67), Insurers do not offer any specific evidence to counter Liman's testimony that SEC staff accepted Bear Stearns' revenue calculations using the fair value methodology, which was ultimately used as the basis for settlement amount. Thus, the Insurers' counter-statement to plaintiffs' Rule 19-A Statement, containing no competent evidence sufficient to raise triable issues of fact in opposition to plaintiffs' showing, is largely inadequate.
II. Exclusions
A. Personal Profit Exclusion
The Insurers also seek to deny coverage on the basis of the personal profit/advantage and known wrongful acts exclusions contained in the policies.
"Whenever an insurer wishes to exclude certain coverage from its policy obligations, it [*5]must do so in clear and unmistakable language. Any such exceptions from policy coverage must be specific and clear in order to be enforced." Exclusions are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction. A construction favorable to the insurer will be sustained only if it is the sole construction that fairly can be placed upon the word employed (Pioneer Tower Owners Assoc. v State Farm Fire & Cas. Co., 12 NY3d 302, 307 [2009]).
The Policies' personal profit exclusion bars coverage for claims against the insured "based upon or arising out of the Insured gaining in fact any personal profit or advantage to which the Insured was not legally entitled" (Policies § IV.9). Under its plain terms, the exclusion does not apply if the profit or advantage actually accrued to some other person. The exclusion is only triggered to the extent that the loss is based upon a personal profit or advantage actually ("in fact") derived by the insured, and the profit itself is unlawful. Thus, the exclusion by its terms would cover only the ill-gotten gains component of a securities claim, subject to other terms and conditions of the Policies.
The SEC order states that Bear Stearns' facilitation of its customers' late trading and market timing practices in its performance of clearing services on their behalf "benefitted their customers and customers of correspondent firms by enabling those customers to generate ... profits" (Administrative Order, 3). The SEC order contains no other allegations or findings that Bear Stearns' profit or gain was in itself illegal. The Court concludes that this exclusion does not apply to bar coverage.
The construction that the Insurers proffer would unreasonably expand the personal profit exclusion so as to bar virtually any potential coverage for securities violations under the Policies. Relying upon Jarvis Christian College v National Union Fire Ins. Co. of Pittsburgh (197 F3d 742, 748-49 [5th Cir 1999]), a Fifth Circuit case applying Texan law, the Insurers assert that any personal profit or advantage gained by Bear Stearns as a result of securities violations triggers the personal profit exclusion, including merely the opportunity to make a profit. Further, the Insurers argue that Bear Stearns' admission that $20 million out of the total $160 million settlement consists of revenues it received from facilitating deceptive market timing and late trading on behalf of its customers in itself triggers application of the exclusion, thereby barring coverage for the remaining $140 million payment.
However, the exclusion applies to any personal profit or advantage that the insured gained "in fact." The inclusion of the qualifying phrase "in fact" makes clear that the parties did not intend for coverage to be excluded under any circumstances merely because Bear Stearns obtained some benefit, but rather intended that coverage would be excluded to the extent that the insured actually derived an unlawful benefit or advantage to which it was not entitled.
The caselaw that the Insurers rely upon to support their contention that the exclusion precludes coverage for claims in toto, is distinguishable and inapplicable. For instance, in American Auto Ins. Co. v Advest, Inc. (2009 WL 3490060, *4 [SDNY 2009]), the improper personal profit exclusion at issue excluded coverage for any claim, inter alia, that is "in any way connected" with improper activities, which is far broader than the language contained in the exclusion in the Policies.
Moreover, the Insurers rely on Jarvis Christian College (197 F3d at 748-49), where the court determined that a member of the board of directors breached his fiduciary duty by recommending that a college invest $2 million into a company that he held a forty-nine percent interest in (Id.). In part, because the board member was plaintiff's representative and reaped a [*6]significant direct personal profit in that capacity, the insurer concluded that it had no duty to defend under the policy. The court agreed with the insurer that the personal profit exclusion applied because the board member's breach of fiduciary duty by engaging in self-dealing resulted in significant personal profit (Id.).
Here, in stark contrast, there is no allegation that Bear Stearns' was not lawfully entitled to earn a fee from performing clearing services for its customers. In addition, the derivative advantage and profit that Bear Stearns gained from facilitating its customers market timing trading was not the basis for liability upon which the SEC's claims were brought (see In re Donald Sheldon & Co., 186 BR 364, 369 [SD NY 1995]). Rather, the personal profit exclusion, by its terms, would be applicable in cases such as theft, insider trading and breach of fiduciary duty (see Astrin v St Paul Mercury Ins. Co., 179 F Supp2d 376 [D Del 2002]). For instance, in Astrin (Id.), cited by plaintiffs, the court notes that "[a]lmost all securities fraud complaints will allege that the defendants did what they did in order to benefit themselves in some way. If such an allegation were sufficient to invoke the protections of 4(a) [the personal profit exclusion], the broad coverage for 'Securities Claims' provided by the [National Union] Policy would be rendered valueless by this exclusion...[and] would swallow up the very securities coverage that the [National Union] policy purports to grant" (see also In re Donald Sheldon & Co., Inc., 186 BR 364).
Similarly, accepting the Insurers' construction that any profit or advantage gained by an insured is sufficient to trigger the exclusion essentially renders the coverage afforded by the Policies illusory, as it would exclude most coverage for securities violations that the Policies are intended to grant.
Finally, there is no dispute that Bear Stearns performed lawful clearing services for which it was entitled to collect fees, and did not derive any greater compensation for late trading and market timing transactions than it did for other mutual fund trades that it cleared. For these reasons, the Insurers fail to demonstrate that the personal profit exclusion bars coverage.[FN6]

Likewise, the Insurers fail to demonstrate that the public policy exception, which bars coverage for loss arising out of intentionally harmful conduct, applies. This exception "is a [*7]narrow one, under which it must be established not only that the insured acted intentionally but, further, that it acted with the intent to harm or injure others" (J.P. Morgan Secs. Inc., 21 NY3d at 334).
The Insurers rely upon the findings contained in the SEC order. However, the Court of Appeals in this action noted that the language of the SEC order alone "does not conclusively demonstrate that Bear Stearns also had the requisite intent to cause harm" (J.P. Morgan Secs. Inc., 21 NY3d at 334). In any event, the SEC order notes that Bear Stearns neither admitted nor denied its findings, and consented to entry of the order solely for purposes of settlement. Otherwise, the Insurers do not submit any evidence that raises a triable issue that Bear Stearns deliberately intended to cause injury to investors, which is the standard for this exception. As noted by the Court of Appeals, even one whose intentional acts cause unintended injury may be indemnified (see generally Town of Massena v Healthcare Underwriters Mut. Ins. Co., 98 NY2d 435, 446 [2002]; Public Service Mut. Ins. Co. v Goldfarb, 53 NY2d 392 [1981]).
In conclusory fashion, the Insurers state that the "documented record of communications among Bear Stearns' employees, the mutual funds and the market timing traders demonstrate as a matter of law that Bear Stearns knew that mutual fund shareholders were being harmed by Bear Stearns' unceasing facilitation of late trading and market timing" (Insurers' memo. in support, 33). The Insurers cite to testimony from several Bear Stearns employees who represent that they were told by their superiors that mutual fund investors believed that market timing transactions were harmful (Insurers' Rule 19-A Statement, ¶¶ 66-67).
These heresay statements are insufficient to raise a triable issue regarding whether Bear Stearns intended to cause harm by facilitating these trades. Plaintiffs counter with testamentary evidence that Bear Stearns employees did not intend, and were largely unaware, that it was actually causing harm to mutual fund investors by facilitating customers' late trading and market timing trades, and in many instances, did not believe that their market timing customers were trying to deceive the mutual funds by disguising their trades (Plaintiffs' Rule 19-A Statement, ¶¶ 97-101, 105-108).
B. Capacity Exclusion
The Insurers also seek to exclude coverage on the basis of the third party liability exclusion, which they interpret to include any claims arising out of the liability of a third party other than the insured acting in its insured capacity.
The exclusion applies to claims "based upon, arising from or in consequence of the liability of a party, other than an Insured in their capacity as Investment Advisor, Security Broker/Dealer, Administrator, and/or Investment Banker pursuant to a contract" (Insurers' Rule 19-A Statement, ¶ 8). By its plain terms, this exclusion bars coverage for claims against the insured in certain capacities. One such capacity that is expressly not subject to the exclusion is when the claim is based on the insured acting in its capacity as a security broker/dealer. Here, the Court can conclude with certainty that the claims in the regulatory and civil actions against Bear Stearns were based upon its violation of securities laws in its capacity as a broker/dealer. 
This Court rejects the Insurers' mischaracterization of the claims at issue and the basis for Bear Stearns' liability which is not, as they maintain, based upon the liability of third parties. Rather, the predicate for Bear Stearns' liability is its own violation of securities laws in its capacity as a broker/ dealer.
C. Reasonableness of Settlements
As this Court previously held, when an insurer declines coverage, as here, an insured may [*8]settle rather than proceed to trial to determine its legal liability (J.P. Morgan Securities Inc., 53 Misc 3d 694 [Sup Ct, NY County, Ramos, J., 2016]). "In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled 'so long as a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]'" (Luria Bros. & Co. v Alliance Assur. Co., Ltd., 780 F2d 1082, 1091 [2d Cir 1986]).
Here, the Insurers largely do not dispute that Bear Stearns faced potential liability, rather, the real issue remains whether the amount it settled for, $140 million, was reasonable.
Plaintiffs highlight that Bear Stearns was facing potentially $520 million in liability to settle SEC charges, under the Delta NAV methodology used to calculate its customers gains. According to plaintiffs, inasmuch as the $140 million settlement payments is just twenty-seven percent of the SEC's initial disgorgement demand, the reasonableness of the payment is self-evident. Further, they maintain that it was the best that could be obtained after sustained negotiation with the SEC. Moreover, plaintiffs assert that the $14 million settlement of the civil actions was a fraction of the claimed exposure and likely far less than the costs of continued litigation.
The Insurers maintain that Bear Stearns refused to provide information to the Insurers about its liability exposure before it finalized its settlement and throughout discovery in this action, and thus, are barred from proffering such evidence now.
On the facts known to Bear Stearns at the time of the settlement with the regulatory agencies, Bear Stearns undoubtedly was potentially liable to the SEC and to civil plaintiffs. The Insurers fail to raise a meaningful triable issue of fact concerning the reasonableness of the settlements.
SEC staff responded to Bear Stearns' initial $40 million offer of settlement with a $720 million counter-demand (Plaintiffs' Rule 19-A Statement, ¶ 58). In response to this perceived high demand, Bear Stearns' counsel prepared and presented an alternate calculation of its customer gains using the "fair value" methodology which showed $140 million in customer gains (Plaintiffs' Rule 19-A Statement, ¶¶ 61-65). SEC staff informed Bear Stearns that it was prepared to recommend a settlement based upon this calculation, in which Bear Stearns would pay $250 million, consisting of a $90 million penalty (which Bear Stearns is not seeking coverage for) and $160 million in disgorgement (Plaintiffs' Rule 19-A Statement, ¶ 65).
With respect to the civil actions, Bear Stearns received an offset for the portion of the disgorgement amount of the SEC settlement that was distributed to compensate investors in the effected mutual funds (Plaintiffs' Rule 19-A Statement, ¶ 86). Class counsel demanded that Bear Stearns pay $415 million to settle the claims, based upon calculations prepared by class plaintiffs' expert (Plaintiffs' Rule 19-A Statement, ¶¶ 87-88). Bear Stearns submits evidence that the remaining exposure remained substantial (Plaintiffs' Rule 19-A Statement, ¶ 90). In June 2010, Bear Stearns settled the civil action for $14 million.
Bear Stearns settled both the regulatory and civil actions for a fraction of its claimed exposure. Under these circumstances, it cannot be said that defending the claims in litigation would have resulted in judgments against Bear Stearns in amounts lower than the settlements (see Clarostat Mfg. Co. v Travelers Indem. Co., 115 AD2d 386, 388-89 [1st Dept 1985]).
The Insurers assert that the Court must find that the settlements were unreasonable as a matter of law, because Bear Stearns blocked them from discovering any information regarding its [*9]own evaluation of its exposure to liability on grounds of attorney client and work product privileges, and it cannot now attempt to prove these facts on summary judgment. The Court rejects this contention.
Over the course of seven years of litigation, plaintiffs have produced voluminous non-privileged material related to the amounts demanded by the regulatory agencies and class plaintiffs, the facts and legal theories alleged as the basis for the demands and liability, and permitted extensive interrogation of its former legal counsel, Lewis Liman, Esq., who represented Bear Stearns in its defense of the regulatory investigations. Moreover, the need to determine the reasonableness of settlements under an objective standard does not require a waiver of the attorney-client privilege and the legal analysis of its counsel (see Deutsche Bank Trust Co. of Ams. v Tri-Links Inv. Trust, 43 AD3d 56, 65-66 [1st Dept 2007]).
Finally, the Insurers have failed to adduce any competent evidence that materially supports its assertion that the settlement amounts were unreasonable (compare Tokio Marine and Nichido Fire Ins. Co., Ltd. v Calabrese, 2013 WL 752259, *10 [ED NY 2013]).
D. Prior Knowledge Exclusion
Above Bear Stearns' (primary) Policies was a $50 million quota share layer consisting of $40 million of coverage provided pursuant to the Lloyd's excess policy and $10 million pursuant to the AAIC excess policy (together, with Lloyd's, the Underwriters) policy (Plaintiffs' Rule 19-A Statement, ¶¶ 4-6). The Lloyd's policy follows form to the Policies except where indicated otherwise (Plaintiffs' Rule 19-A Statement, ¶ 7). One difference from the Policies is a prior known acts exclusion, which provides that the Underwriters can avoid coverage for loss in connection with any claim "for any alleged Wrongful Act(s) committed prior" to March 21, 2000 (the effective date of coverage), "if any officer of the Insured, at such date, knew or could reasonably have foreseen that such Wrongful Act(s) could lead to a Claim," or "any other Wrongful Act whenever occurring, which, together with a known Wrongful Act ... would constitute Interrelated Wrongful Acts" (Plaintiffs' Rule 19-A Statement, ¶¶ 11-12).
Here, the Underwriters assert that Bear Stearns' officers, which it defines broadly, knew of the alleged wrongful acts before the effective date of coverage (March 21, 2000) and knew of interrelated wrongful acts after that date. The Underwriters rely upon the SEC order and its detailed factual findings to support its contention that beginning in 1999, Bear Stearns' "timing desk knowingly or recklessly processed thousands of late trades" (SEC order, ¶ 4).
Plaintiffs highlight that the Underwriters' excess policies do not define "officer," and thus, argue that the policy language should be interpreted against the Underwriters.
The Court determines that the prior known acts exclusion contains an ambiguity, because reasonable people could differ on the meaning of the undefined term "officer." The term could be narrowly interpreted, as plaintiffs contend, to refer only to those individuals elected to officer positions by the board of directors, which include senior management with a high level of authority: the chairman of the board, president, chief executive and financial officers. Plaintiffs cite to caselaw holding that an employee's job title is immaterial, but rather, it is the employee's duties and responsibilities which determine if she is an officer (see C.R.A. Realty Corp. v Crotty, 878 F2d 562, 565-66 [2d Cir 1989]).
Plaintiffs also submit deposition excerpts from numerous Bear Stearns employees whose testimony uniformly reflect an understanding that Bear Stearns' officers include high-level senior management, rather than all of those employees who are labeled as officers (Plaintiffs' Rule 19-A Statement seq 022, ¶¶ 2940). According to Bear Stearns, its by-laws from 2000 identify 456 [*10]senior managing directors, 1,006 managing directors, 1,174 associate directors, and vice presidents, although these employees did not perform executive or managerial duties (Plaintiffs Rule 19-A Statement, seq 022, ¶ 31).
The Underwriters assert that the term officers in the exclusion could be interpreted to refer to all employees whose job title includes the term officer, irrespective of the level of managerial authority, including senior managing and associate directors, assistant secretaries and assistant treasures, all of whom are identified as officers in Bear Stearns' by-laws. According to the Underwriters, the knowledge of any one of these employees of the late trading and deceptive marketing timing practices prior to the effective date of coverage is sufficient to trigger the exclusion.
Because any ambiguity or reasonable doubt as to the meaning of an exclusion is strictly construed against the insurer, the Court rejects the Underwriters' broad definition of officer, and in favor plaintiffs' (accord Pioneer Tower Owners Assoc., 12 NY3d at 308; 242-44 E. 77th Street, LLC v Greater New York Mutual Ins. Co., 31 AD3d 100 [1st Dept 2006]; Federal Ins. Co. v 1030 Fifth Ave. Corp., 262 AD2d 142, 142 [1st Dept 1999]). Thus, the Court adopts plaintiffs' construction of officer, in that it is the performance of important executive and managerial duties that renders one an officer, rather then the label (accord C.R.A. Realty Corp., 878 F2d at 565-66).
With that construction in mind, the Court finds that the Underwriters fail to raise a triable issue that Bear Stearns' officers actually knew, on or before March 2, 2000, of Bear Stearns' facilitation of customers' deceptive late trading and market timing practices, or that such officers could have reasonably foreseen a claim based on those acts.
As this Court previously held, a two-step "mixed subjective/objective standard" is appropriate to determine 1) whether "any officer" of Bear Stearns had knowledge of specific acts of alleged late trading and deceptive marketing timing before March 21, 2000, and 2) whether a reasonable businessperson would expect those wrongful acts to be the basis of a claim (see Liberty Ins. Underwriters Inc. v Corpina Piergrossi Overzat & Klar LLP, 78 AD3d 602, 604-05 [1st Dept 2010]; Executive Risk Indem., Inc. v Pepper Hamilton LLP, 56 AD3d 196, 201 [1st Dept 2008], modified 13 NY3d [2009]). Thus, "even if the evidence establishes as a matter of law that the insured has formed a subjective belief that a suit may ensue based upon some ... misconduct, that does not alone establish the existence of objective facts which would support the conclusion of a reasonable professional that the insured will be subjected to professional liability claims" (emphasis in original) (Id.).
Moreover, an insurance carrier seeking to disclaim coverage based on a prior knowledge exclusion bears a heavy burden to establish that the insured had knowledge of a "clear breach of duty" (United Nat. Ins. Co. v Granoff, Walker & Forlenza, P.C., 598 F Supp2d 540, 549 [SDNY 2009]). In this sense, mere knowledge of "some consequences" of an act is inconsequential, which, standing alone, would not provide a reasonable basis from the insured to believe that it had committed a wrongful act that foreseeably will result in a claim (Liberty Ins. Underwriters Inc. v Corpina Piergrossi Overzat & Klar, LLP, 78 AD3d 602, 607 [1st Dept 2010]).
The Underwriters point to no evidence that any of Bear Stearns' officers had knowledge that its clearing brokers were facilitating deceptive market timing and late trading prior to the effective date of coverage. Thus, the Underwriters fail to demonstrate that there was a reasonable basis to foresee a claim based upon this conduct.
Plaintiffs submit the deposition testimony of the co-president of BSSC, the CFO of BS & [*11]Co., and the head of the operations department, who all testified that they knew nothing about wrongful late trading during this period (Plaintiffs' Rule 19-A Statement, ¶¶ 58, 60-65, 67-69, 80-81).
The Underwriters also seek to rely upon the recitations of the SEC order for the purpose of proving the truth of the matters asserted therein. However, the order explicitly states that Bear Stearns had not admitted liability, and it was not an adjudication of any wrongdoing on the part of Bear Stearns. Thus, the recitations contained in the SEC order are inadmissible as proof of liability (see J.P. Morgan Securities Inc. v Vigilant Ins. Co., 126 AD3d 76, 83-84 [1st Dept 2015]; Borst v Bovis Lend Lease LMB, Inc., 102 AD3d 519 [1st Dept 2013]).
The Underwriters also rely upon the deposition testimony of Mark Hurant, a broker in the PCS department, Adam Feil, a broker in Hurant's group, and James DelVechhio, an associate director of Bear Stearns. However, testimony as to non-officers' knowledge of Bear Stearns' trading practices is not sufficient to trigger the exclusion to bar coverage.
Furthermore, as noted by the Court of Appeals in this action, market timing is not illegal per se but "can be deceptive if it induces a mutual fund to accept trades it otherwise would not accept under its own market timing policies" (J.P. Morgan Sec. Inc., 21 NY3d at n 1; see also Levitt v J.P. Morgan Secur., Inc., 710 F3d 454, 465-66 [2d Cir 2013]). Prior to September 2003, the SEC had never commenced an enforcement proceeding against any market timer or securities firm for market timing, and had not established that existing market timing rules were sufficiently clear to permit liability (S.E.C. v Pentagon Capital Mgt., 844 F Supp2d 377 [SD NY 2012], affirmed in part, vacated in part 725 F 3d 279 [2d Cir 2013]; see also S.E.C. v Ginder, 752 F3d 569 [2d Cir 2014]), in part, because "'the definition of market timing was still evolving'" (S.E.C., 844 F Supp2d at 414-15).
Thus, even assuming arguendo that Bear Stearns officers had knowledge of specific acts of its clearing brokers facilitating late trading and market timing, the Underwriters fail to demonstrate that a reasonable person would have expected that those acts would be the basis of a claim, in light of the state of the law on such trading practices at that time (compare Executive Risk Indem. Inc. v Pepper Hamilton LLP, 13 NY3d at 322-23 [where insured-law firm had knowledge of its client's fraudulent payments prior to its application for excess coverage, coupled with the fact that a reasonable attorney would have concluded that the law firm would likely be included in ensuing litigation relating to the payments, the insurer met its burden of proving the applicability of the prior known acts exclusion]).
III. National Union's motion for partial summary judgment
National Union moves for partial summary judgment that there is no coverage for plaintiffs' claims asserted under its excess policy on the basis that coverage is barred by an identical prior known wrongful acts exclusion. National Union adopts and incorporates by reference all of the Underwriters' factual and legal arguments. Plaintiffs cross-move for partial summary judgment dismissing the defense on the ground that the National Union excess policy never effectively incorporated or amended its policy to add this exclusion, which was merely set forth in a binder.
In light of the Court's conclusion that the prior known wrongful acts exclusion does not bar coverage, the Court will not address plaintiffs' cross-motion.
Accordingly, it is
ORDERED motion sequence 018 by defendant National Union Fire Insurance Company of Pittsburgh, Pa. and the cross-motion of plaintiffs are both denied, as moot; and it is further
ORDERED that motion sequence 019 is granted in its entirety, and defendants' defenses that 1) $140 million of the loss for which Bear Stearns claims coverage is uninsurable because it constituted the disgorgement of Bear Stearns' ill-gotten gains; 2) the loss is excluded under the Person Profit Exclusion; 3) public policy bars indemnification; and 4) the settlements were reasonable are hereby severed and dismissed; and it is further
ORDERED that motion sequence 020 by defendants Vigilant Insurance Company, The Travelers Indemnity Company, Federal Insurance Company, National Union, Liberty Mutual Insurance Company, Certain Underwriters at Lloyd's, London, and American Alternative Insurance Company is denied in its entirety; and it is further
ORDERED that motion sequence 021 by defendants Certain Underwriters at Lloyd's, London and American Alternative Insurance Corporation is denied in its entirety; and it is further
ORDERED that motion sequence 022 by plaintiffs for dismissal of the sixth affirmative defense based on the known wrongful act exclusions is granted in its entirety; and it is further
ORDERED that motion sequence 023 by plaintiffs to supplement the record is denied.
Settle order and judgment.
Dated: April 17, 2017
Hon. Charles E. Ramos
J.S.C.



Footnotes

Footnote 1: Plaintiffs are J.P. Morgan Securities Inc. (JP Morgan), formerly known as Bear, Stearns & Co. Inc. (BS & Co.), and J.P. Morgan Clearing Corp., formerly known as Bear Stearns Securities Corporation (BSSCorp.), and The Bear Stearns Companies LLC, formerly known as The Bear Stearns Companies Inc. (TBSC) (together, Bear Stearns). In 2008, TBSC, through its merger with a subsidiary of JPMorgan Chase & Co. became a subsidiary of JPMorgan Chase & Co.

Footnote 2:
The facts set forth herein are taken from the Court of Appeals' decision in J.P. Morgan Sec. Inc. v Vigilant Ins. Co. (21 NY3d 324 [2013]), the parties' submissions and Rule 19-A Statements.

Footnote 3:"Late trading is the practice of placing orders to buy, redeem or exchange mutual fund shares after the 4:00 p.m. close of trading, but receiving the price based on the net asset value set at the close of trading. The practice allows traders to obtain improper profits by using information obtained after the close of trading" (J.P. Morgan Sec., Inc. v Vigilant Ins. Co., 21 NY3d 324, n 1 [2013]).

Footnote 4:This methodology measures the difference between a mutual fund's NAV on the date on which an investor places a market timing trade or late trade and that fund's NAV the following day (Plaintiffs' Rule 19-A Statement, ¶ 55).

Footnote 5:This methodology measures gains to the investor based on the purchase and sales prices for the market timing and late trading transactions (Plaintiffs' Rule 19-A Statement, ¶ 55).

Footnote 6:Plaintiffs also move to supplement the record in response to the Insurers' introduction of an exhibit in their reply, set forth in exhibit 116 annexed to the Shea affirmation. The Insurers seek to introduce an email exchange between Bear Stearns and insurance underwriters pertaining to negotiations over revisions of the personal profit exclusion which they assert supports the Insurers' construction. However, if a court determines that an exclusion contained within an insurance policy is unambiguous, the Court may not consider matters extrinsic to the policy to discern the intent of the parties which can be gleaned from the instrument itself (West 56th Street Assocs. v Greater New York Mut. Ins. Co., 250 AD2d 109, 112 [1st Dept 1998]). Here, there is no ambiguity in the personal profit exclusion and thus, there is no basis to resort to extrinsic evidence. Accordingly, the Court will not consider the Insurers' submission, exhibit 116 annexed to the Shea affirmation, and plaintiffs' motion to supplement the record is denied, as moot.